IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

RIGOBERTO VALDOVINOS-TAFOLLA

    Defendant.

CRIMINAL ACTION FILE NO.

1:23-cr-359-WMR-JKL

## ORDER AND FINAL REPORT AND RECOMMENDATION

Defendant Rigoberto Valdovinos-Tafolla is charged in this case with conspiracy to possess with the intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841 and 846; possession with the intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B); and illegal re-entry in violation of 8 U.S.C. § 1326(a). [Doc. 13.] The case is presently before the Court on the following pretrial motions:

1.     Defendant's Motion for Production of Name and Location of Confidential Informant(s) (the "Confidential Informant Motion") [Doc. 24];

2.     Defendant's Motion to Suppress Evidence [Doc. 25];

3.     Defendant's Motion for a *Kastigar* Hearing and to Dismiss Indictment and/or Exclude Evidence (the "*Kastigar* Motion") [Doc. 28];

4.     Defendant's Motion to Suppress Pole Camera Surveillance (the "Pole Camera Motion") [Doc. 29]; and

5.     Defendant's Motion to Dismiss Count Three For Violation of Equal Protection (the "Motion to Dismiss") [Doc. 21].

For the reasons that follow, the Court **DENIES** the Confidential Informant Motion

and **RECOMMENDS** that the remaining motions be **DENIED**.[1]

---

[1] The Court pauses to briefly summarize the procedural posture of this case. Mr. Valdovinos was first arrested in this District in June 2020 on a criminal complaint. *See United States v. Valdovinos-Tafolla*, No. 1:20-cr-292-WMR-JKL, Dkt. No. 1. In August 2020, he waived indictment and was charged in a criminal information with one count of conspiracy to possess with intent to distribute a controlled substance. *Id.*, Dkt. No. 14. It appears that he initially intended to plead guilty to the information, but in June 2021, he changed his mind and insisted on a bench trial on the conspiracy charge. *Id.*, Dkt. No. 39 at 4. Mr. Valdovinos did not proceed to trial, however, and the government subsequently indicted him November 2021 on three drug charges. *See generally United States v. Valdovino-Tafolla*, No. 1:21-cr-444-WMR-JKL (the "Previous Case"). In October 2023, the Court dismissed the Previous Case without prejudice under the Speedy Trial Act. *Id.*, Dkt. No. 75. In November 2023, the government re-indicted Mr. Valdovinos on two of the drug charges (Counts One and Two) and added an illegal re-entry charge (Count Three).

In the Previous Case, the parties litigated the Confidential Informant Motion, the Motion to Suppress Evidence, the *Kastigar* Motion, and the Pole Camera Motion, and the undersigned issued a final order and report and recommendation on those motions. Mr. Valdovinos filed objections, which were pending when the Court dismissed the Previous Case. Mr. Valdovinos has renewed those motions; and, for the sake of clarity, the transcript of the evidentiary hearing, the exhibits from that hearing, and the parties' briefs have been re-docketed in this action. [*See* Doc. 23 (granting motion to adopt previously-filed motions and directing clerk to docket materials in this case).] This order and report and recommendation resolves those four previously-filed motions as well as the newly-filed motion to dismiss the illegal reentry count.

## I.   CONFIDENTIAL INFORMANT MOTION

Mr. Valdovinos moves for an order compelling the government to disclose the identity—specifically, "the name, address, birthday, telephone number, location and other identifying information"—of any confidential informant that was used in this case.  [Doc. 24.]  He points out that on at least one occasion, a confidential informant is alleged to have provided him with methylsulfonylmethane ("MSM"), other substances commonly used in the process of manufacturing methamphetamine, and approximately $3,600 in cash, making him directly involved in the alleged criminal activity in this case.  [*Id.* at 3-4.]  Mr. Valdovinos also argues that the informant's familiarity with Mr. Valdovinos and the alleged drug trafficking conspiracy means that the informant's "potential testimony would [] be broad," and would be "connected to nearly any potential defense in this case."  [*Id.* at 4.]  The government opposes the motion, chiefly on the basis that it intends to call the confidential informant[2] as a witness at trial.  [Doc. 35 at 6-7.]  The government further states that to the extent any information about the informant might constitute *Brady, Giglio,* or *Jencks* Act material, it will comply with its disclosure obligations before trial.  [*Id.* at 8; *see also id.* n.2 ("As to any

---

[2] Based upon the parties' submissions, it appears that there is only one relevant confidential informant in this case.

3

contention that the defendant must have access to the CS to determine whether the CS might provide exculpatory information, the government is bound by *Brady* to provide such information.").]

As a general matter, the government has a limited privilege to withhold the identity of confidential informants. *See United States v. Flores*, 572 F.3d 1254, 1265 (11th Cir. 2009). But as the Supreme Court explained in *Roviaro v. United States*, "[w]here the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Flores*, 572 F.3d at 1265 (quoting *Roviaro*, 353 U.S. 53, 60-61 (1957)). In evaluating whether the government should be required to reveal the identity of informants, courts are expected to consider the following three *Roviaro* factors: "(1) the extent of the CI's participation in the criminal activity; (2) the directness of the relationship between the defendant's asserted defense and the probable testimony of the CI; and (3) the government's interest in nondisclosure." *United States v. Razz*, 240 F. App'x 844, 847 (11th Cir. 2007). In balancing these interests, the Court must consider "the particular circumstances of each case, the crime charged, possible defenses, and the potential significance of the informant's testimony." *United States v. Gutierrez*, 931 F.2d 1482, 1490 (11th Cir. 1991).

4

All that said, the concerns surrounding the disclosure of an informant's identity are generally inapplicable when the government intends to call the informant as a witness at trial. *See Banks v. Dretke*, 540 U.S. 668, 697 (2004) ("The issue of evidentiary law in *Roviaro* was whether (or when) the Government is obliged to reveal the identity of an undercover informer the Government does *not* call as a trial witness."); *see also United States v. Rook*, No. 1:15-CR-380-SCJ, 2016 WL 2344877, at *3 (N.D. Ga. May 3, 2016) (rejecting argument that government must disclose informant's identity "where the Government has stated its intention to call the CI as a witness during trial"); *United States v. Pineda*, No. 1:11-CR-006-CAP-JFK, 2012 WL 2906758, at *44 (N.D. Ga. June 4, 2012) ("Neither the Federal Rules of Criminal Procedure, *Brady*, the *Jencks* Act, or *Giglio* require the disclosure of information related to a testifying witness any earlier than the Government has offered to make disclosure in this case."), *report and recommendation adopted*, 2012 WL 2907447 (N.D. Ga. July 16, 2012); *United States v. Elder*, No. 1:10-CR-132-RWS-AJB, 2010 WL 5656687, at *6 (N.D. Ga. Dec. 16, 2010) (explaining that "the concerns in *Roviaro* are not directly applicable" when the government informs the court that the confidential informant will testify at trial), *report and recommendation adopted in relevant part*, 2011 WL 294507 (N.D. Ga. Jan. 27, 2011); *United States v. Mendoza*, No. 1:05-CR-380-

5

RWS-ECS, 2005 WL 8159713, at *1 (N.D. Ga. Sept. 9, 2005) ("[A]s the Government intends to call these informants at Defendant's trial, it is not required to disclose the identities of the informants at this time.").

Here, the government has indicated that, "under the currently indicted charges," it intends to call any confidential informant involved with Mr. Valdovinos in the alleged drug trafficking as a witness during the trial, and that "at the appropriate time before trial," it will disclose the identity of the informant and provide any related *Jencks*, *Brady*, and *Giglio* materials. [Doc. 35 at 7-8.] In light of this representation, the Court will not require the government to disclose the identity of the confidential informant at this time.[3]

But even if the confidential informant in this case were not going to testify at trial, the Court still concludes that Mr. Valdovinos has not met the second *Roviaro* factor identified above—*i.e.*, a direct relationship between his defense and the probable testimony of the informant. The burden is on the defendant to show

---

[3] In his reply, Mr. Valdovinos requests that the Court order the government to provide the identity of the informant at least 30 days prior to trial. [Doc. 36 at 1.] In general, the Court does not consider an argument raised for the first time in a reply brief. *See United States v. Beard*, No. 1:20-CR-00351-SCJ-LTW, 2022 WL 18657429, at *5 (N.D. Ga. June 3, 2022), *report and recommendation adopted*, 2023 WL 372914 (N.D. Ga. Jan. 24, 2023). In any event, the Court is not persuaded that early disclosure of the CI's identity is appropriate here, and therefore declines to order disclosure even 30 days prior to trial.

that the informant's testimony would significantly aid in establishing an asserted defense. *United States v. Johnson*, 702 F. App'x 815, 816 (11th Cir. 2017) (citing *Gutierrez*, 931 F.2d at 1491). "Mere conjecture about the possible relevance of the testimony is insufficient to compel disclosure." *Id*. So, while Mr. Valdovinos points out that the indictment and the affidavits supporting the search warrants in this case indicate that a confidential informant participated directly in the alleged criminal activity, he does not connect any defense to the probable testimony of the informant. Rather, he states conclusorily that the "informant's involvement in the criminal activity in this case is broad," and therefore his "testimony would be directly connected to nearly any potential defense in this case." [Doc. 24 at 4.] This is insufficient. *Johnson*, 702 F. App'x at 816. He has not indicated what information he believes he would obtain from any confidential informant or how it would materially support his defense. Moreover, because the government has represented that it will call the informant at trial, he will not be denied the opportunity to confront the witness.

For the foregoing reasons, then, Mr. Valdovinos's Motion for Production of Name and Location of Confidential Informant(s) is **DENIED**. [Doc. 24.]

## II.   MOTION TO SUPPRESS

In his Motion to Suppress, Mr. Valdovinos challenges the legality of a June 9, 2020 traffic stop and search of his vehicle, during which roughly $70,000 in alleged drug proceeds were seized.  [Doc. 25; *see also* Doc. 32 (post-hearing brief).]  I held an evidentiary hearing on November 22, 2022, at which DEA Special Agent Hillar Moore and Deputy Patrick Kelly from the Clayton County Sheriff's Office[4] testified.  [*See* Doc. 27 (hereinafter "Tr.").]

### A.   Factual Background

The DEA began investigating Mr. Valdovinos around September 2018, after he allegedly received 160 pounds of MSM, a horse vitamin[5] that is also used as a binding and cutting agent[6] in the production and processing of methamphetamine "in the overwhelming majority of clandestine meth labs."  (Tr. 9.)  SA Moore, who previously investigated many dozens of methamphetamine conversion labs, became the case agent in charge of the investigation approximately 10 months later,

---

[4] Deputy Kelly worked for the Clayton County Sheriff's Office during the time period relevant to Mr. Valdovinos's motions; however, since roughly June 2022, he has been employed by the Pennington County Sheriff's Office in South Dakota.  (Tr. 51-52.)

[5] SA Moore testified that Mr. Valdovinos had not been observed with any horses during the course of the investigation.  (Tr. 11.)

[6] SA Moore testified that 160 pounds of MSM could be used to make roughly ten times that amount of distributable methamphetamine.  (Tr. 11-12)

8

in July 2019, when he moved to the DEA's Atlanta office. (Tr. 9-11.) Around that time, SA Moore observed 20 pounds of MSM being delivered to Mr. Valdovinos. (Tr. 12-13.)

In March 2020, law enforcement agents began using a location device on Mr. Valdovinos's vehicle and pinging his cell phone, which revealed that he "frequently visited two locations." (Tr. 12.) While he visited one location—his Alpharetta home—daily or at least nightly, he also visited a house roughly 50 miles away in Rex, Georgia less frequently. (Tr. 12-13.)

Agents placed a live-feed video camera near the Rex house (the "pole camera") that could see the front door, and observed only Mr. Valdovinos entering or exiting. (Tr. 14.) From April through June 2020, the agents also conducted physical surveillance of Mr. Valdovinos and observed him purchasing Igloo coolers, large plastic bins, box fans, acetone, muriatic acid, and Tupperware from different stores before bringing them to the Rex house. (Tr. 13-15.) In SA Moore's experience, Igloo coolers and Tupperware, in combination with the other supplies, were often used in methamphetamine labs. (Tr. 7-8.)

Agents conducted further surveillance. On April 6, 2020, agents observed Mr. Valdovinos discard an item into a public trash can in a Wal-Mart parking lot; and upon retrieving and analyzing it, the agents determined that it contained MSM

that had been cooked with tinfoil, napkins, and plastic scoops.  (Tr. 15-17.)  Next, on April 14, 2020, the agents saw Mr. Valdovinos meet with a waiting vehicle at a dollar store parking lot and conduct what "appeared to be a hand-to-hand transaction, which [wa]s consistent with drug trafficking," though agents could not see what had actually been exchanged.   (Tr. 17-18.)   That same day, Mr. Valdovinos was seen taking several trash bags from his car and placing them into the trash can of his Alpharetta residence; and because agents had on "numerous" occasions observed Mr. Valdovinos place similar trash bags from the Rex house into his car, they conducted a trash pull from Mr. Valdovinos's Alpharetta residence the next morning and discovered that some of its contents field tested positive for methamphetamine.  (Tr. 18-20.)  Then, on April 18, 2020, agents saw Mr. Valdovinos bring several white buckets—consistent with the size and shape of MSM containers—into the Rex house.  (Tr. 20.)

Mr. Valdovinos remained under law enforcement surveillance for a couple more months.  On June 8, 2020, the agents saw him remove two gas tanks from his car, bring them inside the Rex house, and then later return them, apparently empty, to the vehicle.  (Tr. 21.)  Agents observed that the tanks appeared heavy when Mr. Valdovinos brought them into the house, but that that they were light enough that he was able to place them in a trash bag and into his trunk when he returned them.

(*Id.*)  Agents also observed him purchase two cases of muriatic acid, which is "often used in the process of synthesizing liquid meth into crystal meth."  (Tr. 21-22.)

The next day, June 9, 2020, agents observed Mr. Valdovinos leave the Rex house at around 4:00 pm.  (Tr. 23.)  They followed him from the house to a grocery store—either a Kroger or a Publix—and saw him purchase at least 14 Tupperware containers, unwrap them in the trunk of his car, and discard all of the lids into a nearby trash can, which SA Moore "found to be extremely odd."  (Tr. 23-24.)

Later that evening, around 7:00 or 8:00 pm, Mr. Valdovinos was seen leaving the Rex home in possession of two cardboard boxes, which he placed in his car. (Tr. 23-24.)  He drove to a Lowe's parking lot two miles away, parked as far away from the entrance of the store as possible, and waited.  (Tr. 24.)  Soon after, a black Dodge Ram truck parked next to Mr. Valdovinos, who then removed the larger of the two boxes from his own car and placed it in the truck through the rear passenger door.  (Tr. 24-25.)  Based upon his training and experience, as well as his knowledge of the investigation, SA Moore believed that a drug transaction had taken place.[7]  (Tr. 23-24, 38-39.)  When Mr. Valdovinos and the Ram departed, the

---

[7] Even though SA Moore was unable to see whether anything was passed to Mr. Valdovinos, he believed that Mr. Valdovinos likely received money because, in SA Moore's experience, it was "not [] common" for methamphetamine to be

agents followed the Ram rather than Mr. Valdovinos, since agents were already using a tracking device to follow Mr. Valdovinos's car.[8]  (Tr. 25.)  The agents had never seen the truck before, did not know who was driving, and did not know what activities the occupants had been involved in previously.  (Tr. 39-40).

SA Moore's partner, TFO Brian Ballard with the Clayton County Police Office, asked the Henry County Police Department to stop the Ram, but when a marked unit attempted to initiate the stop, the truck fled, which led to a roughly mile-long chase.  (Tr. 25-26.)  During that chase, SA Moore observed the driver throw a white substance from the window, along with lidless Tupperware; and another officer discovered that a cardboard box consistent to the one Mr. Valdovinos placed in the truck had also been discarded along the road.  (Tr. 26-27.)  Most significantly, they retrieved approximately 180 grams of a crystalline substance from the roadway that field tested positive for methamphetamine.  (*Id.*)  At that point, SA Moore left the scene and went to his office to prepare a search warrant application for the Rex house.  (Tr. 28-29, 43.)

---

"fronted to people."  (Tr. 29-30.)  Thus, he believed that the agents would "find proceeds from the drug interaction" with Mr. Valdovinos.  (Tr. 30.)

[8] There were only two law enforcement officers involved in surveilling Mr. Valdovinos that day.  (Tr. 26.)

Meanwhile, other agents used tracking data from the device on Mr. Valdovinos's car to locate him heading south in the direction of the Rex house. (Tr. 28.) SA Moore's partner, TFO Ballard, contacted Deputy Patrick Kelly[9] of the Clayton County Sheriff's Office to request assistance stopping Mr. Valdovinos with a marked police vehicle. (Tr. 28-29, 46.) It was SA Moore's understanding that TFO Ballard conveyed all of the information the agents had about what they had seen Mr. Valdovinos do that day, after which TFO Ballard asked Deputy Kelly to effectuate a traffic stop based upon "the probable cause which we had gained through the observations that day." (Tr. 28-30.) However, SA Moore did not speak with Deputy Kelly directly and had to rely on his understanding of what other officers had conveyed to Deputy Kelly. (Tr. 28.) Regardless, based upon what they had seen that day, the agents believed that Mr. Valdovinos would have money from the suspected methamphetamine transaction in the car, along with the second box from the Rex house. (Tr. 29-30.)

According to Deputy Kelly, he was contacted by TFO Ballard while on patrol around 8:30 pm, and was advised that "they needed a vehicle stopped that

---

[9] Deputy Kelly had received narcotics and gangs training, frequently assisted the Marshals and DEA, and had previously supervised TFO Ballard in Clayton County's Vice Unit. (Tr. 54-55.)

they had just observed conduct a narcotics transaction." (Tr. 54, 56.) TFO Ballard was "pretty clear on what was going on," that "drugs were involved," and that while the other car involved in the transaction had been stopped in Henry County, "they needed us to stop this vehicle, being that they had observed the transaction at hand." (Tr. 55.) TFO Ballard also "advised that he was following [Mr. Valdovinos's car] from the transaction location." (Tr. 56.) Deputy Kelly did not know if they were following him via tracker or if TFO Ballard was tailing Mr. Valdovinos's car. (Tr. 61-62.) Regardless, Deputy Kelly was given the make, model, color, and license plate number of Mr. Valdovinos's car and brief description of Mr. Valdovinos himself. (Tr. 55.)

Deputy Kelly positioned his patrol car at an intersection along Mr. Valdovinos's apparent route, and when he saw the car that TFO Ballard had described a short while later, initiated a traffic stop. (Tr. 56-57.) Deputy Kelly pulled the car over, approached the vehicle, and determined that Mr. Valdovinos[10] did not speak English; nevertheless, Deputy Kelly was able to get him out of the vehicle, handcuffed, and seated on curb by the time TFO Ballard arrived, which happened "pretty much immediately." (Tr. 57-58, 67.) Deputy Kelly began

---

[10] Deputy Kelly identified Mr. Valdovinos as the driver during the evidentiary hearing. (Tr. 59.)

searching the car in a counterclockwise manner, starting with the front passenger side.  (Tr. 59.)  When he searched the rear passenger area, Deputy Kelly discovered a plastic shopping bag on the floorboard, about which he notified TFO Ballard, and then "turned it over to him."  (*Id.*)  Deputy Kelly then watched over TFO Ballard's shoulder as he (TFO Ballard) photographed the vehicle's interior.  (Tr. 60.)  During this time, Deputy Kelly saw "in the center console . . . another shopping bag with [approximately $70,000] of U.S. currency inside."  (Tr. 60-61.)  TFO Ballard handled that money.  (Tr. 61.)  No illicit drugs were found inside the car.  (Tr. 72-73.)

On cross examination, Deputy Kelly clarified that he had been told that the narcotics transaction had been conducted "[j]ust before the phone call" with TFO Ballard, but that Ballard did not give him any other information about the investigation—just that there had been a narcotics transaction and that the other vehicle had been stopped with drugs located inside.  (Tr. 64-65.)  Deputy Kelly did not know what sort of drugs were involved.  (Tr. 65.)  Deputy Kelly specifically remembered that TFO Ballard told him that he "was following the vehicle."  (Tr. 68.)  Part of the reason that Deputy Kelly believed that he had probable cause to search the vehicle was his understanding that the vehicle had been under surveillance.  (Tr. 68-69.)

15

**B.     The Parties' Arguments**

Mr. Valdovinos first argues that the evidence from the June 9, 2020 traffic stop and search should be suppressed because Deputy Kelly lacked probable cause to stop and arrest Mr. Valdovinos.   [Doc. 32.]   In particular, Mr. Valdovinos complains (1) that there was insufficient communication with Deputy Kelly during the investigation, and (2) that during the one phone call TFO Ballard had with Deputy Kelly, TFO Ballard relayed incorrect details about the events of the day; and that as a result, the collective knowledge of SA Moore and the other investigating agents cannot be used to establish probable cause for the June 9 stop and search. [*Id.* at 8-11.] Mr. Valdovinos further argues that the evidence from the June 9 stop and search should be suppressed because the search of the car was not properly incident to arrest, as Mr. Valdovinos was handcuffed away from the car and Deputy Kelly did not know what contraband the vehicle contained. [*Id.* at 11-14.]

In response, the government contends that the DEA and task force officers had probable cause to justify the June 9 stop and accompanying search, and that Deputy Kelly's communications with TFO Ballard were sufficient to invoke the "collective knowledge" doctrine for establishing probable cause. [Doc. 33 at 8-12.]   And in response to Mr. Valdovinos's argument that the search was not

16

properly incident to arrest, the government responds that law enforcement's collective knowledge provided probable cause for a search under the automobile exception to the Fourth Amendment's warrant requirement. [*Id.* at 12-14.] Finally, the government argues that regardless of Deputy Kelly's knowledge of the situation, once he stopped Mr. Valdovinos, it was inevitable that TFO Ballard would have arrested him (Mr. Valdovinos) and discovered the money inside the car. [*Id.* at 14-16.]

### C.    The Collective Knowledge Doctrine Applies to the June 9 Stop

For the collective knowledge doctrine to apply, law enforcement officers must have maintained "at least a minimal level of communication during their investigation." *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985). Where there is minimal communication between different officers, courts evaluate not just the knowledge of the investigating officer, but whether the collective knowledge of all of the officers involved amounts to reasonable suspicion or probable cause. *United States v. Williams*, 199 F. App'x 828, 831 (11th Cir. 2006); *United States v. Allison*, 953 F.2d 1346, 1350 (11th Cir. 1992). As discussed, Mr. Valdovinos contends that the collective knowledge doctrine should not apply because the only communication with Deputy Kelly was the single call from TFO

Ballard instructing Deputy Kelly to conduct a traffic stop, and during that communication, certain details were not conveyed accurately.  [Doc. 32 at 8-11.]

### 1.    Minimum Level of Communication

Starting with Mr. Valdovinos's complaint that Deputy Kelly received only the single short phone call, courts have regularly found such communications—that is, requests for officers to stop and arrest a suspect—to be sufficient to satisfy the "minimum level of communication" requirement.    In *United States v. Kapperman*, the Eleventh Circuit found that, after investigating law enforcement officers lost track of a suspect they had been surveilling for an extended period of time, a single radio call to an otherwise uninvolved police deputy, "instructing him to stop the car and detain [the suspect] for questioning," met the requirement that there was "minimal communication between [the] different officers," such that the arresting deputy "was entitled to act on the strength" of the other officers' collective knowledge.  764 F.2d 786, 789-91, 791 n.5 (11th Cir. 1985).

Following this guidance, courts in this Circuit have regularly found similarly brief calls between investigating and arresting officers to meet the minimum level of communication required for application of the collective knowledge doctrine. *See United States v. Hernandez*, 17 F. Supp. 3d 1255, 1260 (N.D. Ga. 2014) (applying collective knowledge doctrine when arresting officer was only "aware of

18

a bare minimum of information" about an investigation—namely, that the county police department had been asked to assist federal agents in some investigation—when he was directed to effectuate a traffic stop and arrest a suspect); *United States v. Crump*, No. 4:10-CR-032-HLM-WEJ, 2011 WL 6153106, at *4-5 (N.D. Ga. Nov. 21, 2011) (considering the collective knowledge of DEA agents and local law enforcement officers despite there being only a single call to the arresting sheriff's deputy reporting that suspect was believed to be transporting narcotics), *report and recommendation adopted*, 2011 WL 6179211 (N.D. Ga. Dec. 12, 2011); *United States v. Olmedo*, 552 F. Supp. 2d 1347, 1353, 1356-57 (S.D. Fla. 2008) (applying collective knowledge doctrine even though officers with knowledge of drug transaction did not share any details with arresting officers, and instead simply directed that they make a traffic stop and arrest); *accord United States v. Ramirez*, 473 F.3d 1026, 1033-37 (9th Cir. 2007) (summarizing Circuit decisions approving the use of the collective knowledge doctrine where the investigating officer provided nothing more than a description of the suspect to the officer conducting the stop, search, or arrest), *cert. denied*, *Ramirez v. United States*, 552 U.S. 866 (2007).

In the absence of any countervailing authority from Mr. Valdovinos or the Court's own research on this point, *Kapperman* controls. In the end, "effective law

enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another," and "officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information." *United States v. Hensley*, 469 U.S. 221, 231 (1985) (quoting *United States v. Robinson*, 536 F.2d 1298, 1300 (9th Cir. 1976)).  Here, the evidence shows that, at a minimum, TFO Ballard communicated to Deputy Kelly in a "pretty clear" manner that "they had just observed [] a narcotics transaction" and that "they needed a vehicle [involved] stopped," along with details about the vehicle and suspect.  (Tr. 55, 57.)  This communication fits squarely within what *Kapperman* and its progeny consider to be the minimum level of communication necessary to apply the collective knowledge doctrine.

### 2.    Accuracy

Mr. Valdovinos argues that in addition to being too short, TFO Ballard's call to Deputy Kelly was also "incorrect" and "unreliable."  [Doc. 32 at 9.]  According to Mr. Valdovinos, TFO Ballard relayed the following inaccurate information:  (1) "the drug transaction had just happened immediately prior to the phone call," (2) "TFO Ballard had been following the car since the drug transaction," and (3) "the second car had been found with unspecified drugs inside."  [*Id.* at 9-10.]  Without citing any authority in support in his motion or on reply, Mr. Valdovinos asserts

that that these inaccuracies provide another reason to withhold application of the collective knowledge doctrine.  [*Id.* at 10-11; *see also* Doc. 37.]

The Court cannot agree that the information TFO Ballard communicated was so incorrect as to undermine the collective knowledge of law enforcement.  [*See* Doc. 32 at 10.]  As to the first statement, Deputy Kelly testified that TFO Ballard told him, "they needed a vehicle stopped that they had just observed conduct a narcotics transaction."  (Tr. 55.)  Mr. Valdovinos insists, however, that "the phone call was not immediately after the [narcotics] transaction" because before contacting Deputy Kelly, the other officers also chased the Ram truck for a short period, assisted in the cleanup of spilled methamphetamine and other contraband after the truck was stopped, and returned to the office to begin preparing a search warrant application.  [Doc. 32 at 10.]  But as the government points out, SA Moore testified that he saw the defendant leave the Rex house between 7:00 and 8:00 p.m., and Deputy Kelly testified that he received TFO Ballard's phone call around 8:30 p.m.  (Tr. 24, 57.)  Given that some time must have elapsed before Mr. Valdovinos reached the Lowe's parking lot and conducted the exchange with the driver of the Ram truck, the delay between any purported drug transaction and TFO Ballard's call was less than 30 to 90 minutes.  Based on this, the undersigned concludes that "just" was accurately used in this context to indicate to Deputy Kelly that a

21

narcotics transaction had been observed very recently.[11]  And were this not enough, TFO Ballard also conveyed to Deputy Kelly that the second vehicle involved in the alleged narcotics transaction "had already been stopped" and "dealt with" (Tr. 56), which clearly communicated that some meaningful amount of time had already passed (during which this police work had been performed).  Accordingly, the undersigned can find no issue of accuracy or reliability with this first statement.

Mr. Valdovinos also complains that Deputy Kelly testified that he believed TFO Ballard stated that "he was following [the vehicle] from the transaction location," when in fact law enforcement was using a tracker to follow Mr. Valdovinos's car.  (Tr. 56.)  But Deputy Kelly also testified that he never actually knew whether TFO Ballard was "tailing the vehicle" or "if they had a tracker they were following," and that it was "just [his] assumption" that TFO Ballard was physically pursuing Mr. Valdovinos.  (Tr. 61-62; *see also* Tr. 69 ("I remember him saying he was following the vehicle.  I don't know if he had his eyes on it the entire time.").)  Put another way, since TFO Ballard was indeed following Mr. Valdovinos's car by way of a vehicle tracker, his statement was correct, even if it

---

[11] The Merriam-Webster Dictionary, meanwhile, defines "just" in this context as "very recently."  *See* Merriam-Webster Dictionary, "Just," located at Merriam-Webster.com (last accessed February 1, 2024).

were subject to at least two different reasonable interpretations.  But without some argument or authority from Mr. Valdovinos to explain why this small ambiguity should serve to undermine the application of the collective knowledge doctrine, the undersigned will not do so here.

Finally, Mr. Valdovinos takes issue with TFO Ballard's statement to Deputy Kelly that drugs had been found in the other vehicle, when in fact they had been found on the road.  But Mr. Valdovinos ignores that law enforcement witnessed the driver of the other car discard a white substance from the window of the vehicle, which upon inspection, tested positive for methamphetamine.  So, while the statement made to Deputy Kelly was not technically accurate as to where methamphetamine had been recovered following the chase, it was still the case that a substance testing positive for methamphetamine had been observed by law enforcement to have been inside the second vehicle after the transaction with Mr. Valdovinos.  In any event, without some explanation for why a minor misstatement would undermine the collective knowledge doctrine, the undersigned declines to do so here.  *See United States v. Chanthasouxat*, 342 F.3d 1271, 1276 (11th Cir. 2003) ("A traffic stop based on an officer's incorrect but reasonable assessment of facts does not violate the Fourth Amendment."); *United States v. Jones*, No. 1:11CR004-WKW, 2011 WL 3182769, at *3 (M.D. Ala. June 29, 2011) ("The

23

court cannot conclude that this relatively minor discrepancy has constitutional significance, in light of the accuracy of the remaining description and the past reliability of the informant."), *report and recommendation adopted*, 2011 WL 3182410 (M.D. Ala. July 27, 2011).

For the foregoing reasons, the Court will consider law enforcement's collective knowledge in its probable cause analysis below.

### D.    The Search of the Car was Justified by Probable Cause

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  "To guarantee this right, the Fourth Amendment generally requires law enforcement officers to obtain a warrant before conducting a search."  *United States v. Delva*, 922 F.3d 1228, 1243 (11th Cir. 2019).  There are, of course, exceptions to the warrant requirement, including one for automobiles, which the government urges should apply in this case.  [Doc. 33 at 13-15.]

"Under the automobile exception to the warrant requirement, the police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained."  *Delva*, 922 F.3d at 1243 (internal quotation marks omitted).  Thus, "[f]or a warrantless search of an automobile to be

24

constitutional," only two requirements must be met:  "(1) the automobile must be readily mobile, and (2) there must be probable cause to believe that it contains contraband or evidence of a crime." *United States v. Lanzon*, 639 F.3d 1293, 1299-1300 (11th Cir. 2011).  Probable cause, meanwhile, exists to conduct a warrantless search when "there is a fair probability that contraband or evidence of a crime will be found in the vehicle" under the totality of the circumstances.  *United States v. Tamari*, 454 F.3d 1259, 1261-62 (11th Cir. 2006) (internal quotation omitted).  Probable cause requires more than a mere suspicion but does not require the same "standard of conclusiveness and probability as the facts necessary to support a conviction." *United States v. Dunn*, 345 F.3d 1285, 1290 (11th Cir. 2003) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002)).  And, as discussed immediately above, based upon the collective knowledge doctrine, a court may "impute the knowledge of one or more other officers to the one who specifically engages in the search or other conduct at issue" to establish probable cause.  *United States v. Hernandez*, No. 1:20-cr-196-7-LMM-JSA, 2022 WL 2133877, at *5 (N.D. Ga. Jan. 28, 2022), *report and recommendation adopted*, 2022 WL 1499338 (N.D. Ga. May 12, 2022).

In this case, the warrantless stop and search of the truck was justified because Mr. Valdovinos's car was clearly mobile[12] and law enforcement collectively had probable cause to believe that it contained evidence of an illegal drug transaction. As discussed above, the agents surveilling Mr. Valdovinos had observed that (1) only Mr. Valdovinos entered or exited the Rex house; (2) Mr. Valdovinos transported many supplies that are typically be used in a clandestine methamphetamine labs—including large quantities of MSM, buckets, gas tanks, igloo coolers, box fans, acetone, cases of muriatic acid, and Tupperware with discarded lids—to the Rex house; (3) Mr. Valdovinos engaged in a hand-to-hand transaction in a dollar store parking lot that was consistent with an illegal drug transaction; (4) plastic trash bags that likely came from the Rex house and were in fact discarded at Mr. Valdovinos's Alpharetta home contained methamphetamine; (5) Mr. Valdovinos engaged in a transaction that was consistent with an illegal drug deal in the back of the Lowe's parking lot; (6) during the transaction, he placed one of two cardboard boxes from his own car into the other vehicle, a black Dodge Ram truck; (7) the Ram then fled when police attempted to stop it; (8) a substance testing

---

[12] The first prong, vehicle mobility, is easily met because the car was being driven at the time it was stopped, which is enough. *See United States v. Marsh*, 663 F. App'x 888, 892 (11th Cir. 2016).

positive for methamphetamine had been thrown out of the truck as it fled; and (9) Mr. Valdovinos still appeared to have a second box in his own vehicle, having disposed of only one of the two boxes during the transaction in the Lowe's parking lot. This evidence—and law enforcement's collective knowledge of it—provided probable cause to believe that an illegal drug transaction involving methamphetamine had likely taken place and that evidence of that crime would be found inside Mr. Valdovinos's car. *See United States v. Alston*, 598 F. App'x 730, 734 (11th Cir. 2015) ("[P]robable cause existed to believe that the car, which was being used as an instrument of drug-trafficking activity, contained additional evidence of drug-trafficking activity, such as drug paraphernalia, cash, or records of drug transactions, among other things."); *United States v. Brazel*, 102 F.3d 1120, 1146-47 (11th Cir. 1997) (finding probable cause to justify warrantless search of the car because circumstances indicated it was used to facilitate drug offenses); *see also United States v. Willix*, 723 F. App'x 908, 911 (11th Cir. 2018) (finding probable cause when officers knew a package contained illicit drugs, defendant showed up to collect the package, and defendant evaded apprehension); *United States v. Morris*, No. 1:19-CR-389-LMM-CCB, 2020 WL 7497333, at *7 (N.D. Ga. Nov. 10, 2020) (finding probable cause despite never having confirmed the identity of another suspect or the drugs that were to be exchanged), *report and*

27

*recommendation adopted*, 2020 WL 7495610 (N.D. Ga. Dec. 21, 2020); *United States v. Edenilson-Reyes*, No. 1:09-CR-00361-RWS, 2010 WL 5620439, at *2 (N.D. Ga. Oct. 26, 2010) (finding probable cause based on conversations intercepted over the defendant's phone and subsequent observation of suspicious events that were consistent with the phone calls), *report and recommendation adopted*, 2011 WL 195679 (N.D. Ga. Jan. 20, 2011); *United States v. Jackson*, 548 F. Supp. 2d 1314, 1321 (M.D. Fla. 2008) (finding probable cause when alleged supplier identified a vehicle suspected of transporting drugs and then same vehicle was seen again when surveillance revealed the supplier had returned to the area).[13] And because law enforcement had probable cause to believe that evidence of a drug transaction would be found in Mr. Valdovinos's car, the automobile exception to the warrant requirement applies, and the Motion to Suppress should be **DENIED**.[14]

---

[13] Mr. Valdovinos's further argument that probable cause does not exist because "Deputy Kelly did not identify any thing that he was looking for," is without merit, as "both [the Eleventh Circuit] and the Supreme Court have rejected inquiry into an officer's subjective intentions in reviewing the constitutionality of searches and seizures under the Fourth Amendment." *Alston*, 598 F. App'x at 733 (rejecting argument that automobile exception requires that law enforcement's belief about the crime supplying probable cause match the crime the suspect is in fact arrested on).

[14] Because the automobile exception applies, the Court need not address Mr. Valdovinos's argument that the June 9 stop and search was not a proper search incident to arrest, or the government's contention that TFO Ballard's discovery of the money was somehow inevitable.

## III.   *KASTIGAR* MOTION

Mr. Valdovinos next moves the Court to hold a *Kastigar* hearing to determine whether the government impermissibly used statements or information subject to a proffer letter agreement, and if so, to either dismiss the indictment or exclude evidence improperly utilized.  [Doc. 28.]  For the following reasons, the undersigned finds that no hearing is necessary, and that neither dismissal nor exclusion of evidence is warranted.

### A.   Background on Mr. Valdovinos's Proffer and the Grand Jury Presentation

On June 22, 2020, while represented by counsel,[15] Mr. Valdovinos met with SA Moore and AUSA Miguel Acosta for a proffer session.  [Doc. 28 at 17.]  TFO Ballard, TFO Andy Cross, and a Spanish translator were also present.  [*Id.*]  In relation to that proffer session, Mr. Valdovinos and his attorney executed a letter agreement containing the following terms:

> 1.  The United States Attorney's Office for the Northern District of Georgia ("the Government") requires complete and truthful statements of your client, with no material misstatements or material omissions of fact.  No information provided by you or your client to the Government during the proffer session will be used against him in the grand jury or in the Government's case-in-chief (subject to the terms set forth below).  Likewise, no statements made by your client during the proffer session will be

---

[15] At the time, Mr. Valdovinos was represented by a different attorney than present counsel.  [*See* Doc. 28 at 17.]

used against your client to increase his Sentencing Guidelines offense level in the pending case (subject to the terms set forth below). Crimes of violence are excluded from the terms of this agreement.

2. The Government is completely free to pursue any and all investigative leads derived in any way from the proffered information, which could result in the acquisition of evidence admissible against your client in subsequent proceedings.

3. If your client (or you on behalf of your client) subsequently takes a position in any legal proceeding that is inconsistent with the proffered information – whether in pleadings, oral argument, opening statement, witness testimony, documentary evidence, questioning of witnesses, at a sentencing hearing, or in any other manner – the Government may use your client's proffered statements (and all evidence obtained directly or indirectly therefrom) in any responsive pleading and argument, for cross-examination, impeachment, or rebuttal evidence, and as affirmative evidence in the Government's case-in-chief. The Government may also use statements made by your client in the proffer session(s) to respond to arguments made or issues raised *sua sponte* by the Magistrate or District Court. . . .

4. If your client willfully makes false or misleading statements during the proffer . . . the Government may use your client's proffer statements and all evidence obtained directly or indirectly therefrom. Also, in such a prosecution, your client's proffer statements may be used at any stage, including, but not limited to, proceedings before the grand jury, and during all phases of any resulting trial, including the Government's case-in-chief.

*** ***

6. In agreeing to provide a proffer to the Government, your client agrees that the use of any statements or information provided by him/her shall be governed by the terms and conditions set forth in this letter agreement. Furthermore, your client waives any right to challenge the admissibility of an such

> statements or information under Federal Rule of Criminal
> Procedure 11 and Federal Rule of Evidence 410.

[Doc. 28 at 14-15.][16]

According to a DEA Report of Investigation, during the proffer session, Mr. Valdovinos consented to a search of the three phones seized during his arrest, executed a DEA-88a Consent to Search Form for the phones, and provided the passcodes to access their contents. [*See* Doc. 28 at 17 (Report of Investigation).] He also provided information confirming that he (1) operated a clandestine methamphetamine lab; (2) received liquid methamphetamine in gas tanks; (3) communicated with at least one other "cook" on how to produce methamphetamine; and (4) on the day of his arrest, delivered several pounds of methamphetamine to two different individuals. [*Id.* at 17-18.]

As discussed above, Mr. Valdovinos subsequently waived indictment and the case proceeded against him on an information. On November 9, 2021, Mr. Valdovinos was indicted for production and distribution of methamphetamine. *See*

---

[16] The remaining paragraphs of the Proffer Agreement—that is, paragraphs 5, 7, and 8—merely explain that Mr. Valdovinos would not receive any promise(s) in relation to the disposition of the charges against him, that the United States Attorney's Office for the Northern District of Georgia would not share his statements with other United States Attorneys' Offices without an agreement to abide by the terms of the Proffer Agreement, and set forth a merger and whole agreement provision. [Doc. 28 at 15.]

Previous Case, Dkt. no. 1.   SA Moore testified at the grand jury proceedings, largely about the events leading to Mr. Valdovinos arrest on June 9, as observed by law enforcement agents.  [Doc. 28 at 19-35.]  But SA Moore also testified that in relation to one of the cell phones recovered:

> Yes, one of the cell phones we found had conversations—I believe they were on What[sApp]—with a Mexican phone number where Mr. Valdovinos—this is all in Spanish—where he sent a photo of where he was parked in the Lowe's parking lot to the Mexican phone number.  And then later, he sent another photograph of dark-colored dually truck [to the] same Mexican phone number through What[sApp].

[*Id.* at 32-33.]

Following the dismissal of the Previous Case, the government presented its case to a different grand jury.  [*See* Doc. 43, Ex. 1 ("Grand Jury Tr.").]  SA Moore testified at the grand jury proceedings.  [*Id.*]  With respect to the drug counts, he testified about the events leading to Mr. Valdovinos's arrest that law enforcement observed.  [*Id.* at 4-11.]  These included:

- On September 23, 2018, a DEA Confidential Source delivered approximately 160 pounds of MSM to Mr. Valdovinos.  [Grand Jury Tr. at 4.]

- In July 2019, a DEA Confidential Source delivered about 20 pounds of MSM to Mr. Valdovinos.  [*Id.* at 4-5.]

- In March 2020, SA Moore obtained a GPS ping warrant for Mr. Valdovinos's phone, which revealed Mr. Valdovinos frequented 2924 Preston Drive in Rex, Georgia, but did not appear to live there and did not stay there overnight.  Agents also observed him bringing items into the residence they knew were frequently used in clandestine methamphetamine production.  [*Id.* at 5.]

- Agents were able to determine that, while Mr. Valdovinos lived in Alpharetta, he traveled to the Preston Drive location several times a week.  [*Id.*]

- In April 2020, agents observed Mr. Valdovinos bringing buckets, bins, fans, gas tanks, muriatic acid, and pH test kits into the Preston Drive residence.  [*Id.* at 6.]

- On June 8, 2020, agents observed Mr. Valdovinos go to Home Depot and purchase muriatic acid, and then later that day bring marine-style gas tanks into the residence.  [*Id.* at 6-7.]

- On June 9, 2020, agents conducting surveillance of Mr. Valdovinos observed him go to a convenience store near the Preston Drive residence and buy 14 Tupperware containers.  Agents then saw him

remove the containers from their packaging, discard the tops, and take the containers to the Preston Drive residence. [*Id.* at 7.]

- At around 8:00 p.m. on June 9, 2020, agents conducting pole camera surveillance saw Mr. Valdovinos exit the Preston Drive residence with two large Home Depot style cardboard boxes and place them into his vehicle. Mr. Valdovinos then drove to a Lowe's shopping center. SA Moore, who was parked at the shopping center, observed Mr. Valdovinos park in a remote part of the lot. A short time later, he saw a black truck pull up next to Mr. Valdovinos, after which Mr. Valdovinos got out of his vehicle, removed one of the boxes from the back of his car, and placed it in the back of the truck. The truck and Mr. Valdovinos then went their separate ways. [*Id.* at 8.]

- The agents followed the truck and saw its driver throw a cardboard box and a white powdery substance out the window. The substance tested positive for methamphetamine. The agents also seized a Tupperware container that did not have a lid, which was consistent with the containers Mr. Valdovinos had purchased earlier in the day. The driver of the truck was arrested. [*Id.* at 8-9.]

34

- The agents did not follow Mr. Valdovinos because they were able to electronically track his location.  Mr. Valdovinos was pulled over and arrested later that evening.  A search of his car yielded about $70,000 in U.S. currency, but the other cardboard box that the agents saw Mr. Valdovinos place into the car was not found there.  [*Id.* at 9-10.]

- Agents then executed a search warrant for the Preston Drive residence, where they seized around 1.285 kilograms of methamphetamine in a Tupperware container; three igloo-sized containers that contained a substance that tested positive for crystal meth; a large stovetop pot containing two gallons of what field-tested positive for as liquid methamphetamine; one five-gallon bucket of an oily substance that tested positive for liquid methamphetamine; and numerous items consistent with a clandestine methamphetamine lab including, box fans, drying bins, igloo containers, pots, pans, pH test kits, MSM, muriatic acid, and acetone.  [*Id.* at 10-11.]

As to the illegal re-entry count, SA Moore testified concerning Mr. Valdovinos's immigration history, including that he was a Mexican citizen, that he had been removed from the United States on three prior occasions, and that he had reentered the United States in Laredo, Texas without permission.  [*Id.* at 11-12.]

35

## B.     The Parties' Contentions

Prompted by SA Moore's disclosure of information recovered from one of the three cell phones, Mr. Valdovinos filed his present *Kastigar* Motion.[17]  In his motion, he argues that the Proffer Agreement prevents the government from using his phones and materials recovered from them against him, either before the grand jury or in its case-in-chief.  [Doc. 28 at 6-8.]  He also contends that the Court should conduct a *Kastigar* hearing at which the government must demonstrate that any evidence offered to the grand jury, or that it will offer in its case-in-chief, have sources independent of the information immunized by the Proffer Agreement; and to the extent such evidence does not have an independent source, he requests that it be excluded and, if necessary, the indictment dismissed.  [*Id.* at 8-12.]

The government opposes the motion, arguing that the Proffer Agreement allows derivative use of the information obtained from Mr. Valdovinos's proffer session—that is, that the Agreement only prohibits direct use of the actual

_____

[17] *See Kastigar v. United States*, 406 U.S. 441 (1972).  In *Kastigar*, the Supreme Court held that when a government entity seeks to prosecute a witness who has been immunized under the federal immunity statute, 18 U.S.C. §§ 6001, *et seq.*, it has "the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Id.* at 460.  That duty has been extended to informal immunity agreements, such as proffer letter agreements; thus, a *Kastigar* hearing would provide the government with an opportunity to meet its burden of demonstrating that evidence it offers came from a source independent of testimony immunized by a proffer agreement.

statements made by Mr. Valdovinos during his proffer—and, because the contents of the phone were only derivatively obtained, that is, by using the passcodes provided during the proffer, they were permissibly introduced before the grand jury and may be introduced at trial.  [Doc. 30 at 5-13.]  Along these lines, the government highlights that while Mr. Valdovinos may have made immunized statements, provided his consent to search the phones, and disclosed the passcodes for them during the proffer session, the actual contents of the devices were not disclosed during the proffer and thus remain derivative evidence that can be used at any stage of the proceedings.  [*Id.*]  Beyond that, the government argues that even if derivative use were prohibited by the Proffer Agreement, any improper disclosure to the grand jury was harmless, and neither dismissal nor the full suppression called for by Mr. Valdovinos is appropriate.  [*Id.* at 13-15.]  Finally, the government has included an addendum that purports to show an independent basis for all the information disclosed to the grand jury, and asks the Court to consider it in lieu of holding a *Kastigar* hearing.  [*Id.* at 15-16; *see also* Doc. 43 at 5-13.]

Mr. Valdovinos maintains in his reply that the Proffer Agreement provides both direct and derivative use immunity to the information conveyed during the proffer sessions (or is ambiguous on the point and should be construed against the

government), but that in any event, because he consented to the search of his phones during the proffer session, the contents were not derivative evidence and were immunized from use by the Proffer Agreement.  [Doc. 31 at 2-8; *see also id.* at 7 n.1 (noting different readings of the Proffer Agreement).]  Mr. Valdovinos also argues that an evidentiary hearing is necessary for the government to meet its burden, since (1) an evaluation of harmlessness cannot be made absent a hearing; (2) the participants in the proffer session worked on the investigation, and it remains unclear what precautions they took to segregate immunized information from the larger investigation to dispel any taint; and (3) in any event, the agents at the proffer session are likely to testify at trial.  [*Id.*; *see also* Doc. 44 at 1-3.]

### C.    Analysis

#### 1.    The Proffer Agreement Provided Only Use Immunity

"Due process requires the government to adhere to the terms of any plea bargain or immunity agreement it makes." *United States v. Harvey*, 869 F.2d 1439, 1443 (11th Cir. 1989) (collecting cases).  "This is true because . . . by testifying under a grant of immunity [a defendant] forgoes his fifth amendment privilege." *Id.* at 1444.  And "because due process requires [the Court] to enforce the government's agreement . . . [it must] apply the same rules and method of analysis

to an informal grant of use or transactional immunity as [it] would to a formal grant," through statutory immunity. *Id.*

In the case of proffer agreements, the Court must "look to and, if necessary, interpret the text of the agreement," applying basic principles of contract law when the "parties disagree about the meaning of the terms." *United States v. Hill*, 643 F.3d 807, 875 (11th Cir. 2011) (citing *Taylor v. Singletary*, 148 F.3d 1276, 1284 (11th Cir. 1998) and *United States v. Thompson*, 25 F.3d 1558, 1562 (11th Cir. 1994)); *see also United States v. Pielago*, 135 F.3d 703, 709 (11th Cir. 1998) ("The construction of proffer agreements . . . is governed generally by the principles of contract law, as we have adapted it for the purposes of criminal law.") (citing *United States v. Weaver*, 905 F.2d 1466, 1472 (11th Cir. 1990) and *Rowe v. Griffin*, 676 F.2d 524, 528 (11th Cir. 1982)). Notably, however, such agreements should not be read "hyper technical[ly]" or with a "rigidly literal approach," but should be "viewed against the background of the negotiations," and "[a]ny ambiguities in the terms of a proffer agreement should be resolved in favor of the criminal defendant." *Pielago*, 135 F.3d at 709-10 (citations and quotations omitted).

The first step in this process is to "determine the scope of the promise the government made to [Mr. Valdovinos] in the proffer agreement." *Hill*, 643 F.3d at 875. In the present case, Mr. Valdovinos and the government primarily disagree

about whether the Proffer Agreement allows the government to make use of derivative evidence—evidence that was not itself directly relayed during the proffer session, but was instead obtained indirectly using the information provided during the proffer—against Mr. Valdovinos before the grand jury and in its case-in-chief.

In support of his position that the Proffer Agreement provides derivative use immunity, Mr. Valdovinos points to the Eleventh Circuit's *Hill* decision to argue that while the Proffer Agreement allows the government to pursue "investigative leads" based upon information relayed during the proffer sessions, it does not specifically provide for the "use" of such derivative evidence before the grand jury or in its case-in-chief.[18]  [Doc. 28 at 6-8.]   Mr. Valdovinos highlights that the relevant provision granting the government freedom to "pursue" and "acquir[e]" evidence derived from information related during proffer session does not include the word "use" in describing how the government may utilize derivative evidence against Mr. Valdovinos, and that the other provision on the permissible "use" of immunized evidence is instead limited to specific instances enumerated in the

---

[18] Or is at least ambiguous on the point, and that ambiguity should be resolved in favor of disallowing derivative use.

40

Proffer Agreement—*e.g.*, if the defendant testifies at trial in manner contrary to the information provided at the proffer. [*Id.* at 11-12; *see also* Doc. 28 at 6-7.]

The government, meanwhile, argues that the agreement in *Hill* is distinguishable, and that the Court should follow the interpretations laid out in *Pielago*, 135 F.3d at 709; *United States v. Patel*, 19 F.3d 1231 (7th Cir. 1994); and *United States v. Harrell*, No. 1:17-cr-00386-SCJ-RGV, 2018 WL 6796175 (N.D. Ga. Nov. 9, 2018), *report and recommendation adopted*, 2018 WL 6788182 (N.D. Ga. Dec. 26, 2018), which construed very similar language—regarding the pursuit of investigative leads to obtain admissible evidence—to allow the government to use derivative evidence against a defendant. [Doc. 30 at 6-14.] Thus, according to the government, while Mr. Valdovinos's statements at the proffer session were immunized (including statements relaying the phones' passcodes), the contents of his phone were not, and were only obtained derivatively from the codes provided by Mr. Valdovinos. [*Id.* at 7-15.]

The undersigned agrees with the government, in that the language of the proffer agreement at issue in *Hill* was sufficiently different to distinguish its treatment from the one that should be given to Mr. Valdovinos's Proffer Agreement. In *Hill*, the relevant provisions provided:

> Anything related to the proffer cannot and will not be used against [the defendant] in any Government case-in-chief. Nor

41

would any statements be used against [the defendant] to increase his offense level pursuant to the Sentencing Guidelines (Section 1B1.8) should charges be filed or a conviction occur.

. . .

[T]he Government is completely free to pursue any and all investigative leads derived in any way from the proffer.

. . .

Similarly, nothing, including Rule 11(e)(6), Federal Rules of Criminal Procedure, shall prevent the Government from using the substance of the proffer and/or leads derived therefrom for impeachment or in rebuttal testimony should [Rector] subsequently testify in any proceeding contrary to the substance of the proffer or in a prosecution for perjury, false statements, or obstruction of justice.

*Hill*, 643 F.3d at 875.  For present purposes, the undersigned will refer to the three foregoing provisions as follows:  the "immunity provision," which generally identifies the type immunizing protection the government is offering the defendant; the "investigative leads" provision, which addresses how the government may investigate otherwise immunized statements or evidence to obtain and potentially use additional evidence derived from them; and the "exceptions" provision, which sets forth the circumstances under which immunized evidence may nevertheless be admitted in the case.

In *Hill*, the Eleventh Circuit explained that the immunity and derivative leads provisions in that proffer agreement "point in opposite directions":  the immunity

42

provision offered "broad" coverage over "anything related to the proffer," but the derivative leads provision also described a "broad" liberty the government retains in pursuing investigative leads derived from the proffered information. *Hill*, 643 F.3d at 875. The Eleventh Circuit nevertheless concluded that that *Hill* proffer agreement prohibited derivative use of the proffer information by the government for three reasons. First, it found that the conflict between the immunity and investigative leads provisions created an ambiguity, which based upon the case law discussed above, was to be resolved in favor of the defendant. *Id.* at 874-75. As the Circuit Court put it, "the one who laid out the diverging paths loses." *Id.* at 875. Second, while the exceptions provisions in the agreement "expressly permit[ed] the government to use leads derived from the proffered information against [the defendant] in specified circumstances," such as impeachment or as rebuttal evidence, none of those instances included its case-in-chief; and, as a result of that design, the "inference is that which is not included is excluded." *Id.* (collecting cases on interpretive canon *expressio unius est exclusio alterius*). In other words, precisely because the investigative leads provision did not affirmatively discuss whether derivative evidence could be utilized as evidence against the defendant, the Circuit inferred that the only occasions were those set forth in the exceptions provision. Third and finally, the Eleventh Circuit observed

43

that the government knew how to draft agreements that "reserved the right to use derived evidence," and pointed to the other proffer agreements used with co-defendants in the *Hill* case, as well as those from two other cases, in which the investigative leads provisions better acknowledged that derivative evidence would also be immunized.  *Id.* at 876 (citing *United States v. Schwartz*, 541 F.3d 1331, 1355 (11th Cir. 2008) and *Pielago*, 135 F.3d at 710).

Importantly, in discussing the differences between the various proffer agreements, the Eleventh Circuit specifically highlighted the investigative leads provisions at use in those other agreements, and explained that in them, the government had "expressly reserved the right to use derived evidence against the defendant" by including the following language:

- the government "reserves the right to pursue any and all investigative leads derived from statements and information *and to use such derivative evidence in any criminal or civil proceeding* against [the defendant] and others";

- "[t]he government also expressly reserves the right to pursue any and all investigative leads derived from [the defendant's] statements or information *and use such derivative evidence in any criminal or civil proceeding against her and/or others*."

*Id.* at 876 (cleaned up and emphasis added) (quoting *Schwartz*, 541 F.3d at 1355). According to the Eleventh Circuit, the inclusion of this language about the use of evidence acquired from investigative leads "show[s] that the government knows

44

how to clearly and expressly reserve the right to make derivative use of proffered information against the one supplying it when the government wants to do so." *Id*.

Although *Hill* is insightful for its discussion of the foregoing interpretive principles, the government is correct that Mr. Valdovinos's Proffer Agreement diverges enough from the *Hill* agreement that the Agreement here should be treated differently. The three main reasons for this are tied directly to the Eleventh Circuit's reasoning in *Hill*. First, the immunity provision at issue in *Hill* was broader in scope than the one contained in Mr. Valdovinos's Proffer Agreement. In *Hill*, the proffer agreement's immunization extended to "***anything related to the proffer***"; and because the government was separately and explicitly barred from "presenting to . . . the jury any and all evidence it obtained, ***either directly or indirectly***, from information and documents [that the defendant] provided to the government," the immunity provision encompassed both direct and derivative use immunity, largely because that the terms of that provision extended the scope of immunization to anything "related to"—that is, in any way connected to or associated with—the information provided at the proffer. *Hill*, 643 F.3d at 875 (emphasis added). In this case, by contrast, the Proffer Agreement promised only that the government would not use "***information provided*** by you or your client to the Government ***during the proffer session***," which would encompass only direct

45

use immunity for the information Mr. Valdovinos provided during the proffer session in the first instance.  [Doc. 28 at 14 (emphasis added).]

Second, the *Hill* agreement materially diverges from Mr. Valdovinos's in another important respect:  unlike the investigative leads provision at issue in *Hill*, which was completely silent as to whether and when any evidence acquired as the result of investigative leads could be offered into evidence,[19] Mr. Valdovinos's Proffer Agreement states that:

> The Government is completely free to pursue any and all investigative leads derived in any way from the proffered information, ***which could result in the acquisition of evidence admissible against your client in subsequent proceedings***.

[Doc. 28 at 14 (emphasis added).]  This language, plainly stating that evidence derived from Mr. Valdovinos's immunized statements may be obtained and then admitted—that is, ***used as evidence***—during subsequent proceedings, places Mr. Valdovinos's proffer agreement more in line with those of the *Hill* co-defendant, the defendant in *Schwartz*, and the defendant in another recently decided case from this District, *United States v. Harrell*, 2018 WL 6796175.[20]

_____

[19] Unlike the exceptions provision, which, in all of the agreements, largely allows the government to make use of immunized evidence if and when a defendant later recants that information or otherwise engages dishonesty or perjury.

[20] The Court has conducted independent research, and other than a handful of less helpful cases, the *Hill* decision, along with those identified by the

*Harrell* in particular—a recent decision from this District not given any treatment by Mr. Valdovinos and only brief mention by the government—involved a proffer agreement without material differences from Mr. Valdovinos's Proffer Agreement and provides the third rationale for distinguishing *Hill*. *See Harrell*, 2018 WL 6796175, at *2 (proffer agreement language). The *Harrell* immunity provision and investigative leads provisions stated in relevant part:

> 1. The United States Attorney's Office for the Northern District of Georgia (the Government) requires completely truthful statements of your client. Anything related to the Government by you or your client during the proffer cannot and will not be used against him in the grand jury or in the Government's case-in-chief. No statements made by your client during the proffer will be used against your client to increase his offense level pursuant to the Sentencing Guidelines . . . in the pending case. Crimes of violence are excluded from the terms of this paragraph.
>
> 2. The Government is completely free to pursue any and all investigative leads derived in any way from the proffer, which could result in the acquisition of evidence admissible against your client in subsequent proceedings.

*Id.* at *1. The defendant in *Harrell* challenged the use of putatively immunized evidence—both direct evidence from the proffer and derivative evidence obtained

---

government, are the only cases to address language substantially similar to the "investigative leads" provision in Mr. Valdovinos's Proffer Agreement.

through investigative leads—in the government's grand jury presentation as contrary to the terms of the proffer agreement. *Id.* at *3.

The court in *Harrell* distinguished *Hill* based upon its use of "[a]nything related to the proffer" to broaden the immunity provision outside of what was shared during the proffer, and concluded that the provision allowing the government to pursue investigative leads for the acquisition of "evidence admissible against [the defendant]" demonstrated that the government was permitted to affirmatively use derivative evidence before the grand jury and at trial. 2018 WL 6796175, at *4-5.  The court explained that with those changes, the tension and ambiguity found in *Hill* had been resolved, and observed that there were no separate problems created by the placement of an exceptions provision immediately below the derivative leads provision. *Id.* at *5 n.6.  Addressing the defendant's argument that the exceptions provision could itself render the agreement ambiguous, the court in *Harrell* disagreed, concluding that "it does not limit the derivative use reserved in the [investigative leads provision], but merely specifies circumstances in which the government may respond to and rebut statements [the defendant] makes that are inconsistent with his proffered

statements."[21]  *Id.*  In other words, the Court found the proffer agreement clear and unambiguous—that the immunity provision created only limited use immunity, that the investigative leads provision allowed for the government to use evidence derived from proffer information, and that the exceptions provision only applied to immunized statements made during the proffer.  *Id.*[22]

---

[21] Although another opinion from this District, *United States v. Culton*, No. 1:18-cr-00168-TCB-JKL-2, Dkt. No. 274 (N.D. Ga. 2022), decided on upon the undersigned's recommendation, found similar language to be ambiguous, it did so in part because the proffer agreement combined the derivative leads and exceptions provisions into a single, confusing paragraph about when direct and indirect evidence could be used, all of which created an ambiguity that would be construed against the government. *See id.* at 16-18 ("The Court agrees that the plain language of the proffer agreement is ambiguous.  At a minimum, Culton's proposed interpretation is a reasonable one.  As he argues, the second paragraph allows the Government to pursue investigative leads based on his information [that is, the investigative leads provision], but the subsequent sentences [that is, the exceptions provision] can be construed to limit how that evidence can be used against him."). Because Mr. Valdovinos's Proffer Agreement fully separates the two provisions, the *Harrell* analysis—finding no ambiguity to arise between the investigative leads and the exceptions provisions when they were contained in two separate paragraphs—is more persuasive than *Culton* in the resolution of the present case.

[22] *Patel* and *United States v. Bryant*, decided by or out of the Seventh Circuit, treated nearly identical language, immunizing "anything related to the government" but allowing the pursuit of "investigative leads" that "could result in the acquisition of evidence admissible against" the defendant, to permit the use of derivative evidence in the government's case-in-chief. *See Patel*, 19 F.3d at 1234; *Bryant*, 420 F. Supp. 2d, 873, 874 (N.D. Ill. 2006).  The undersigned finds these decisions persuasive.

Based upon the foregoing discussion, the undersigned concludes that Mr. Valdovinos' Proffer Agreement also provides only direct use immunity.  The broad language of *Hill*'s immunity provision is not present in this case, and the derivative leads provision of Mr. Valdovinos's Proffer Agreement clearly anticipates that derivative evidence would be obtained, admitted, and used at later proceedings, leaving no tension or ambiguity between the provisions.  And finally, the Court agrees with *Harrell* that the mere presence of the exceptions provision does not create tension or ambiguity with the investigative leads provision, but merely spells out when direct use immunity may be defeated.

In sum, the undersigned finds the reasoning set forth in *Harrell* persuasive, and concludes that the Proffer Agreement in this case only immunized the information Mr. Valdovinos provided directly to the government during his proffer session, but does not extend to protect information or evidence indirectly derived from the proffer.

### 2. Dismissal of the Instant Indictment is Not Warranted

Having interpreted the scope of the immunity protections in the proffer letter, the Court next takes up Mr. Valdovinos's request for a *Kastigar* hearing at which he would have the government show by preponderance of the evidence that immunized testimony was not used to obtain the indictment and that the evidence

used came from legitimate, sources independent of his proffer statements.  SA

Moore's grand jury testimony, which the Court has summarized above, however,

demonstrates on its face that no immunized testimony was used by the government

to obtain the indictment.  Specifically, SA Moore testified about the investigation

that he and other agents performed, all of which occurred ***before*** the proffer session.

Because there is no colorable basis to believe that any immunized information was

communicated to the grand jury, a *Kastigar* hearing is not necessary and dismissal

of the indictment is not warranted.[23]  *See Harrell*, 2018 WL 6796175 at *5 ("Thus,

a *Kastigar* hearing is 'not required in this case because, at most, the government

provided [Harrell] with use immunity, not derivative use immunity.') (quoting

*United States v. Short*, 387 F. App'x 308, 314 n.3 (4th Cir. 2010)); *see also United

States v. Mathis*, 239 F. App'x 513, 515-16 (11th Cir. 2007) ("The district court

ruled that because the Government did not grant Mathis any immunity related to

the proffer, a *Kastigar* hearing was unnecessary. We agree."); *United States v.

Perraud*, No. 09-60129-CR-ZLCOH, 2010 WL 298601, at *9 (S.D. Fla. Jan. 20,

2010) ("[Derivative u]se immunity offers greater protection to the person

---

[23] Because Mr. Valdovinos simply renewed the motion to dismiss the indictment that he filed in the Previous Case, and a separate grand jury returned the indictment in this case, the Court focuses on the information that the government used to secure the present indictment.

immunized than does direct use immunity . . . in that under a direct use agreement, the Government need not have independently obtained the information used against the person immunized, thus, avoiding the need for a *Kastigar* hearing."); *United States v. Lansing*, No. 8:06-CR-104-T-27EAJ, 2006 WL 8453252, at *5 (M.D. Fla. Aug. 4, 2006) ("Since Defendant did not receive immunity for derivative use as part of his proffer agreement, a *Kastigar* hearing is unnecessary") (collecting authority), *report and recommendation adopted in relevant part*, No. 8:06-CR-104-T-27EAJ, 2006 WL 2460665 (M.D. Fla. Aug. 23, 2006); *cf. United States v. Breeden*, 149 F. App'x 197, 201 (4th Cir. 2005); *United States v. Catano*, 65 F.3d 219, 226 (1st Cir. 1995).[24]

### 3.   Contents of Mr. Valdovinos's Phones

The Court next addresses Mr. Valdovinos's argument that the contents of his phones are immunized because he consented to their search and provided the passcodes to unlock them during the proffer.  If the contents of the phone were provided to the government during the proffer, as Mr. Valdovinos contends, then

---

[24] Mr. Valdovinos concedes that if the Proffer Agreement provides only direct use immunity, a hearing is not required.  [*See* Doc. 44 at 3 n.1.]

the government would be prohibited from using the information in its case-in-chief.[25]

The problem with Mr. Valdovinos's argument is that he fails to provide any theory on or citation to authority addressing how he provided ***the contents*** of the phone (as opposed to providing a ***method for accessing*** those contents) to the government during the proffer session, or how the contents might be immunized by the Proffer Agreement providing only direct use immunity (but not derivative use immunity).   As he admits, during the proffer session, he merely "signed a Consent to Search Form (DEA-88a) allowing agents to search his three cell phones" that were obtained during his arrest weeks earlier, and then "provided the passcodes to" them.  [Doc. 28 at 3.]  There is no indication anywhere in the record that the phones themselves were unlocked and reviewed at the proffer session or that the contents of the phones were even discussed, much less that Mr. Valdovinos specifically discussed his WhatsApp communications or the photographs from his phones during his proffer session.

---

[25] SA Moore testified about the contents of the phones before the grand jury that returned the indictment in the Previous Case, and based on that, Mr. Valdovinos argued that a *Kastigar* hearing was needed and that dismissal was warranted.  [*See* Doc. 28.]  But none of those arguments apply to the present case, as SA Moore did not mention the phones or their contents when he testified before the grand jury that indicted Mr. Valdovinos on the current charges.

In a case very much like the one before the Court, the District Court for the District of Columbia found that a defendant's immunized proffer statements, providing access to his phone's contents, would not serve to extend immunity to the phone's contents as well.  *See United States v. Otunyo*, No. CR 18-251 (BAH), 2021 WL 638817, at *12 (D.D.C. Feb. 18, 2021).  As the court there stated:

> [T]he government's alleged use of his iPhone password to access his WhatsApp chats and bolster the charges in the Superseding Indictment would not have violated the terms of the proffer letter. . . .  [E]ven if defendant's allegation were true that the government was able to access his WhatsApp chats only because he provided his iPhone password at the November 2, 2018 debriefing session, his statement providing the iPhone password was not directly used against him in the Superseding Indictment. Instead, even under defendant's version of events, the government used information he provided to discover a further lead and new evidence, namely his WhatsApp chats. As defendant acknowledges, that would qualify as derivative use expressly allowed by the proffer letter.

*Id.* (citing *United States v. Hubbell*, 530 U.S. 27, 43 (2000) and *United States v. Hemphill*, 514 F.3d 1350, 1355-56 (11th Cir. 2008)).  The undersigned agrees with this reasoning, and in the absence of authority to the contrary, finds that the government's use of the phones' contents before the grand jury amounted to derivative use of information Mr. Valdovinos provided during his proffer session, and therefore did not violate the terms of the Proffer Agreement.

### 4.     Request to Exclude Evidence

Mr. Valdovinos contends that a *Kastigar* hearing is necessary so that the Court can also evaluate whether there is an independent source for the evidence the government intends to present at trial.  [Doc. 28 at 12.]  But Mr. Valdovinos's concerns about a potential *Kastigar* violation are simply too remote to justify holding such a hearing.  *See United States v. Vander Luitgaren*, 556 F. Supp. 2d 1313, 1320-21 (M.D. Fla. 2008) ("While the government bears the burden of showing by a preponderance that a *Kastigar* violation did not occur, Defendant cannot raise theoretical *Kastigar* claims based upon every event that occurred post-proffer.") (citing *United States v. Byrd*, 765 F.2d 1524, 1529 (11th Cir. 1985)).  Recall that by the time Mr. Valdovinos participated in the proffer, the government had essentially completed its investigation.  In addition, the scope of the immunity granted by the Proffer Agreement is limited to use immunity, which means that there is just a very small subset information that the government cannot use.  If the government attempts to introduce that evidence that Mr. Valdovinos proffered during the session, Mr. Valdovinos can raise an objection at that time.[26]  *See*, *e.g.*, *United States v. Kilroy*, 27 F.3d 679, 686-87 (D.C. Cir. 1994) ("A trial court may

---

[26] The information that Mr. Valdovinos provided is set out in the DEA report. [*See* Doc. 28 at 17-18.]

hold a *Kastigar* hearing pre-trial, post-trial, mid-trial (as evidence is offered), or it may employ some combination of these methods.") (cleaned up) (quoting *United States v. North*, 910 F.2d 843, 854 (D.C. Cir.)) (quotation marks omitted).  A full-blown mini-trial based on the mere possibility of a *Kastigar* violation, however, is unwarranted.

### D.    Summary

In sum, the proffer agreement in this case immunized only the information that Mr. Valdovinos provided directly to the government during his proffer session, but did not extend to protect information or evidence indirectly derived through the use of investigative leads shared by Mr. Valdovinos during the proffer.   And because Mr. Valdovinos's *Kastigar* Motion is premised on his contention that the proffer agreement provided derivative use immunity, a *Kastigar* hearing is not warranted, and the request to either dismiss the indictment or exclude evidence should be **DENIED**.  [Doc. 28.]

## IV.    MOTION TO SUPPRESS POLE CAMERA SURVEILLANCE

In his Pole Camera Motion, Mr. Valdovinos seeks to suppress the footage from the pole camera surveilling the Rex house.  [Doc. 29.]  In support, Mr. Valdovinos surveys decisions from various courts in other circuits that have expressed concerns about the potential intrusiveness of pole camera surveillance,

argues generally that their modern usage is categorically different from "conventional surveillance techniques," and urges that *Carpenter v. United States*, 138 S. Ct. 2206, 2220 (2018), and its progeny make "technologically advanced pole camera" surveillance a search under the Fourth Amendment. [*Id.* at 5-8.] Based upon this, Mr. Valdovinos argues that the pole camera surveillance of the Rex house violated his reasonable expectation of privacy.

To claim the protection of the Fourth Amendment, a defendant must "demonstrate a reasonable expectation of privacy against government intrusion." *United States v. Cooper*, 203 F.3d 1279, 1283-84 (11th Cir. 2000) (citing *Katz v. United States*, 389 U.S. 347, 353 (1967)). To establish that, the defendant must manifest a subjective expectation of privacy in the area or items searched or seized, and society must be prepared to recognize that expectation as legitimate or objectively reasonable. *Rehberg v. Paulk*, 611 F.3d 828, 842 (11th Cir. 2010) (citation omitted); *United States v. Miravalles*, 280 F.3d 1328, 1331 (11th Cir. 2002) (citation omitted). In other words, a defendant must establish both a subjective and an objective expectation of privacy. *United States v. Segura-Baltazar*, 448 F.3d 1281, 1286 (11th Cir. 2006) (citation omitted).

The government argues that Mr. Valdovinos's motion must be denied because he did not have an expectation of privacy in the Rex house because he did

not live there.  [Doc. 34 at 5-7.]  To this, Mr. Valdovinos responds that he is not challenging the search of the house, but rather the pole camera surveillance that captured his own movements, even in "areas that are 'public.'"  [Doc. 38 at 3, 5-6.]  As he sees it, his situation is "much more analogous to a challenge to a wiretap in which the defendant is captured on the wiretap, and is therefore an aggrieved party."  [*Id.* at 3.]  He also observes that there was no indication that anyone other him was ever present at the house, that there is no proof of what he allegedly did in the residence, and that the agents reportedly saw him on the surveillance footage multiple times.  [*Id.* at 4.]

The Court is constrained to agree with the government that Mr. Valdovinos has not shown that he had a reasonable expectation of privacy in either the Rex house or in his personal movements around there.  As for the residence, Mr. Valdovinos has not proffered any evidence that he lived in or leased the Rex house. Indeed, SA Moore testified that from their surveillance, Mr. Valdovinos spent the night at his residence in Alpharetta and "would infrequently visit" the Rex house. (Tr. at 14.) *See United States v. White*, No. 4:22-CR-017-WMR-WEJ-5, 2023 WL 8530500, at *7 (N.D. Ga. Aug. 25, 2023) (concluding that defendant who did not live at locations monitored by pole cameras "lack[ed] standing to make a Fourth Amendment challenge to the cameras the Government installed at these

58

locations"), *report and recommendation adopted*, 2023 WL 7703553 (N.D. Ga. Nov. 15, 2023).

Mr. Valdovinos's argument that he had an expectation of privacy in his movements also falls flat.  To recap, SA Moore testified that the pole camera was placed down the road from the Rex house, with a view of the front of the residence, including the driveway and front door.  (Tr. at 14.)  There is no suggestion that Mr. Valdovinos was captured on surveillance in an area other than when he was in front of the house, in an open area where anyone could view him.  And he fails cite authority to demonstrate that he had any expectation of privacy that society would be willing to accept as reasonable in what happened in the open, public areas in front of a home.  *Cf. Katz*, 389 U.S. at 351 ("What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection"); *United States v. Moore*, No. 14-20206, 2014 WL 4639419 (S.D. Fla. Sept. 15, 2014) (denying defendant's motion to suppress pole camera footage after concluding that defendant had no subjective expectation of privacy in property in plain sight and freely accessible to the public).

Mr. Valdovinos instead cites the Supreme Court's decision in *Carpenter* to argue that pole camera usage violates his right to be free of surveillance that captures "*his own movements*," even in "areas that are 'public.'"  [Doc. 38 at 3, 5-

6.]  But *Carpenter* is distinguishable.  In *Carpenter*, the Supreme Court held that the third-party doctrine does not apply to retrospective collection of cell-site location information ("CSLI") for periods of at least seven days because "an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI."  138 S. Ct. at 2217.  There, the government obtained an order under the Stored Communications Act to obtain historical CSLI for Carpenter's cell phone for a 127-day period from one service provider and seven days from a second.  *Id.* at 2212.  Central to the Court's reasoning was that people carry cell phones at all times, which means that cell-site information can provide an "***all-encompassing record of the holder's whereabouts***."  *Id.* at 2217 (emphasis added).  As the Court explained, "[a] cell phone faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales."  *Id.* at 2218.  Historical CSLI also "gives police access to a category of information otherwise unknowable"—potentially allowing the government to reconstruct an individual's movements for years.  *Id.*  In short, by accessing such accumulated historical CSLI, the government "invaded Carpenter's reasonable expectation of privacy ***in the whole of his physical movements***."  *Id.* at 2219 (emphasis added).

60

In the years since *Carpenter* was decided, there have been many Fourth Amendment challenges to the use of pole camera surveillance.  While the weight of authority has traditionally been that "cameras capturing movements that can be seen by anyone do not implicate the Fourth Amendment," *United States v. Bronner*, No. 3:19-CR-109-J-34JRK, 2020 WL 3491965, at \*21 (M.D. Fla. May 18, 2020), *report and recommendation adopted*, 2020 WL 3490192 (M.D. Fla. June 26, 2020) (collecting cases), there have been a limited number of opinions that have recognized a Fourth Amendment interest in pole camera surveillance that was particularly intrusive—for instance pole camera surveillance that could pan, tilt, and zoom in on small text or that created a searchable video log agents could access at their convenience, *see, e.g., People v. Tafoya*, 490 P.3d 532, 542 (Colo. App. 2019), *aff'd*, 494 P.3d 613 (Colo. 2021) (finding pole camera that could pan, tilt, zoom; that recorded all footage continuously; and that provided a video archive to review amounted to a Fourth Amendment search); *United States v. Moore-Bush*, 381 F. Supp. 3d 139, 149 (D. Mass. 2019) (granting motion to suppress pole camera footage after concluding that *Carpenter* and *United States v. Jones*, 565 U.S. 400, 415 (2012) overruled prior case law on pole camera surveillance), *rev'd and*

61

*remanded*, 963 F.3d 29 (1st Cir. 2020) and 36 F.4th 320 (1st Cir. 2022) (en banc), *cert. denied*, 143 S. Ct. 2494 (2023).[27]

That said, courts in the Eleventh Circuit have continued to follow the traditional approach to pole camera surveillance, even after *Carpenter*.  For instance, in *United States v. Gbenedio*, a judge on this Court found the main cases cited by Mr. Valdovinos inapposite and "easily distinguished," because they both involved full time location tracking—CSLI in *Carpenter* and GPS tracking in *Jones*—of an individual's position in a way that enabled law enforcement to reconstruct "a detailed and comprehensive log of a person's movements over such a long period, based only on the use of a device so ubiquitous in modern life."  No. 1:17-CR-430-TWT-JSA, 2019 WL 2177943, at *3 (N.D. Ga. Mar. 29, 2019), *report and recommendation adopted*, 2019 WL 2173994 (N.D. Ga. May 17, 2019).  Without the same sort of invasive and continuous long-term tracking of the person—including into private areas—the court found *Carpenter*'s concerns inapplicable to pole cameras.  *Id.* at *3-4; *see also White*, 2023 WL 8530500, at *7

---

[27] As is evident from the citation above, the First Circuit reversed and remanded the trial court's decision in *Moore-Bush* during both the initial appeal and again upon a rehearing en banc.  *See* 963 F.3d 29 (1st Cir. 2020); 36 F.4th 320 (1st Cir. 2022) (en banc).  The Supreme Court then denied certiorari.  143 S. Ct. 2494 (2023).

n.15 (N.D. Ga. Aug. 25, 2023) (declining to extend *Carpenter* to cameras located in open, public areas). Another example is *United States v. Fanning*, where another judge on this Court addressed a motion to suppress footage taken by a pole camera installed by law enforcement outside of an industrial warehouse. *See* No. 1:18-CR-362-AT-CMS, 2019 WL 6462830, at *3 (N.D. Ga. May 28, 2019), *report and recommendation adopted*, 2019 WL 3812423 (N.D. Ga. Aug. 13, 2019). In denying the motion, the Court acknowledged the *Carpenter* decision's importance, but found that the decision was, by its own terms, a "'narrow one' that that should not 'call into question conventional surveillance techniques and tools, such as security cameras.'" *Id.* (citing *Carpenter*, 138 S. Ct. at 2220). Based on this, the Court found that the pole camera surveillance at issue, despite including a "continuous wireless video feed" that ran nonstop for seven weeks, was more "akin to a security camera," which was "expressly excluded from [*Carpenter*]'s holding." *Id.* at *4. Likewise, in *United States v. Bronner*, again faced with a motion to suppress pole camera footage, a district court in Florida recognized the *Carpenter* decision, as well as precedent in other circuits that "have found the Fourth Amendment is implicated" by pole camera surveillance, but declined to follow those cases because the camera in question only recorded for seven weeks, the footage was no better than a normal investigator could see from public view, and

the feed was "at times sporadic."  2020 WL 3491965, at *23 (M.D. Fla. May 18, 2020).  Finally, in *United States v. Flores*, the Court had this to say about pole camera surveillance of a residential location for approximately two-and-a-half months[28]:

> The images of a single, fixed location captured by the pole camera in this case do not equate with the activities revealed by cell-site location information considered by the Court in *Carpenter*.   The Supreme Court in *Carpenter* made that distinction clear:  "We do not . . . call into question conventional surveillance techniques and tools, such as security cameras."

No. 1:19-CR-364-MHC-JSA, 2021 WL 1312583, at *8 (N.D. Ga. Apr. 8, 2021) (quoting *Carpenter*, 138 S. Ct. at 2220).  The undersigned finds this authority persuasive.

In the end, historical CSLI that comprehensively captures an individual's movements, both public and private, over an extended period is categorically different than a single pole camera that captured images of a single, fixed location—here, the front of the Rex house and driveway—and only "infrequently" filmed Mr. Valdovinos entering or exiting.  (*See* Tr. 14-15).  Moreover, Mr. Valdovinos has not identified any advanced technology unique to the pole camera

---

[28] The facts of the *Flores* case are laid out in the Magistrate Judge's report and recommendation on the motion to suppress.  *See United States v. Flores*, No. 1:19-CR-364-MHC-JSA, 2021 WL 1897152, at *11 (N.D. Ga. Feb. 5, 2021), *report and recommendation adopted*, 2021 WL 1312583 (N.D. Ga. Apr. 8, 2021).

in this case, suggested that the investigators gained a particularly unusual vantage point with the camera's installation, offered allegations that the camera was able to avoid obstructions or see anything about Mr. Valdovinos (or anyone else for that matter) that was not otherwise plainly observable to the public, or explained how the live feed captured anything approaching the whole of his movements during the time period it was recording.  [*See* Docs. 35, 38.]  Without something more, the undersigned sees no reason to depart from the traditional approach in the Eleventh Circuit, which considers footage obtained from standard pole cameras to be outside the bounds of Fourth Amendment protection.  Accordingly, Mr. Valdovinos's Pole Camera Motion is due to be **DENIED**.[29]

---

[29] On reply, Mr. Valdovinos also argues that an evidentiary hearing is needed to learn more about the pole camera's operation and Mr. Valdovinos's reasonable expectation of privacy.  [Doc. 38.]  However, "[a] motion to suppress must in every critical respect be sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented . . . .  A court need not act upon general or conclusory assertions . . . ."  *United States v. Richardson*, 764 F.2d 1514, 1527 (11th Cir. 1985) (internal citations omitted).  In other words, "[d]efendants are not entitled to evidentiary hearing based on a 'promise' to prove at the hearing that which they did not specifically allege in their motion to suppress."  *United States v. Cooper*, 203 F.3d 1279, 1285 (11th Cir. 2000) (denying request for a hearing to establish a reasonable expectation of privacy in a hotel room).  In this case, Mr. Valdovinos has not identified any particular piece of information required to perfect his motion nor has he identified any putative facts that, if confirmed, would justify granting his suppression motion.  In other words, even if Mr. Valdovinos could establish at a hearing that the camera recorded continuously, that agents could access it remotely, and that agents could use it to zoom in, pan, and tilt, suppression would not be warranted because it did not invade

## V.   MOTION TO DISMISS COUNT THREE

The Court finally turns to Mr. Valdovinos's motion to dismiss Count Three of the indictment, which charges him with illegally re-entering the United States in violation of 8 U.S.C. § 1326(a).  [Doc. 21.]

### A.   The Parties' Contentions

Section 1326 generally prohibits a noncitizen who has been deported and removed from the United States from reentering the country without permission.  8 U.S.C. § 1326(a).  Although the statute was enacted as part of the Immigration and Nationality Act of 1952 ("INA"), its history traces back to its precursor, the Undesirable Aliens Act ("UAA"), a 1929 law the INA repealed.  *United States v. Patterson*, No. 3:21-CR-103 (VAB), 2023 WL 348970, at *2 (D. Conn. Jan. 20, 2023) (discussing legislative history of the INA).  According to Mr. Valdovinos, the UAA was enacted with a racially discriminatory purpose, and even after its repeal and the enactment of § 1326, the taint of racism remains; and even now, the statute continues to disparately impact Mexican and Latino individuals.  Invoking the strict scrutiny standard articulated in *Village of Arlington Heights v. Metropolitan Hosing Development Corp.*, 429 U.S. 252 (1977), Mr. Valdovinos

---

an area in which Mr. Valdovinos had an objectively reasonable expectation of privacy—namely open areas in front of a residence he did not own, lease, or reside.

urges the Court to find that § 1326 violates the equal protection guarantee of the Fifth Amendment and dismiss Count Three.  [Doc. 21.]

The government responds that the rational basis, rather than strict scrutiny, standard applies and that § 1326 readily satisfies that standard.  [Doc. 41 at 10-16.]  Alternatively, the government argues that even under strict scrutiny analysis, Mr. Valdovinos has not carried his burden to show that § 1326 has a disparate impact or discriminatory purpose.  [*Id.* at 16-28.]

## B.    Analysis

As noted, the parties dispute whether rational basis review or strict scrutiny applies.  The Court need not decide that issue because under either standard, Mr. Valdovinos's motion fails.

Turning first to rational basis review, Mr. Valdovinos cannot prevail under this standard for the simple reason that he offers no argument that § 1326 is not supported by a rational basis.  In this vein, the Court finds persuasive the analysis in a decision out of this District, *United States v. Rodriguez-Soto*, No. 4:22-CR-0018-SEG-WEJ, 2022 WL 17852518 (N.D. Ga. Dec. 21, 2022), where the court wrote:

> The Eleventh Circuit has stated that under the rational basis test, a law does not violate equal protection "so long as [it is] rationally related to a legitimate government interest."  *United States v. Ferreira*, 275 F.3d 1020, 1025 (11th Cir. 2001).  Here,

> Mr. Rodriguez-Soto makes no argument that § 1326 is not supported by a rational basis, instead focusing on the application of *Arlington Heights*.  He thus fails to meet his burden to show that § 1326 does not satisfy rational-basis review.

*Id.* at *3; *accord United States v. Barcenas-Rumualdo*, 53 F.4th 859, 865 (5th Cir. 2022) (holding that defendant who "made no showing that § 1326 is not supported by a rational basis" failed "to meet his burden to show that § 1326 does not satisfy rational-basis review").  And so it goes for Mr. Valdovinos.  Since he has made no showing that § 1326 is unconstitutional under rational basis scrutiny, he has not carried his burden under that basis of review.

But even under the more demanding *Arlington Heights* standard, Mr. Valdovinos's arguments fall short.  In *Arlington Heights*, the Supreme Court held that a facially neutral statute can violate the Fifth Amendment's guarantee of equal protection if it is motivated by discriminatory intent.[30]  429 U.S. at 265-66.  "To show that a statute violates equal protection, a litigant must prove that the statute was enacted for a discriminatory purpose or intent and that it has a disparate impact." *Rodriguez-Soto*, 2022 WL 17852518, at *3 (citing *Arlington Heights*, 429 U.S. at 265-66).  If the litigant makes such a showing, the burden "shifts to the government to show it would have enacted the law without the discriminatory

---

[30] Mr. Valdovinos concedes, as he must, that § 1326 is facially neutral.  [Doc. 21 at 4.]

purpose." *Id.* (citing *Arlington Heights*, 429 U.S. at 264-65).  The Eleventh Circuit has identified eight factors relevant to determining if a statute was passed with a discriminatory purpose:  (1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; (5) the contemporary statements and actions of key legislators; (6) the foreseeability of the disparate impact; (7) knowledge of that impact; and (8) the availability of less discriminatory alternatives.  *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1322 (11th Cir. 2021).

Mr. Valdovinos argues that the UAA had a disparate impact on non-white immigrants and was motivated at least in part by a discriminatory purpose and that the enactment of the INA in 1952 did not purge the taint of discrimination that infected the UAA.  [Doc. 21 at 8-33 (citing *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), and *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246 (2020)).  He further argues even if reenactment of a statute could cleanse the racism that motivated the enactment of the UAA, contemporaneous evidence from around 1952 showed that that the INA enactment was also motivated in part by discriminatory intent.  [*Id.* at 33-35.]  As evidence that the reenactment of the INA did not cleanse the statute of its racial taint, Mr. Valdovinos specifically argues

that:  (1) the 1952 Congress ignored the racial animus that motivated the enactment of the predecessor statute; (2) President Truman vetoed the bill because it "would perpetuate injustices of long standing against many other nations of the world," and because the bill would "continue, practically without change," the discriminatory practices of the previous legislation—and yet, Congress overrode the veto; (3) in a letter submitted to Congress by Deputy Attorney General Peyton Ford supporting the bill, he described the bill's targets as "wetbacks" and called for the statute to be amended to allow immigrants to be prosecuted wherever they were found; (4) Congress nicknamed the bill the "Wetback Bill"; and (5) even now Congress has remained silent in the face of evidence showing that § 1326 disproportionately affects Mexican and Latino people.  [*Id.* at 34-35.]  Finally, citing demographic statistics regarding defendants in illegal re-entry cases and those arrested at U.S.-Mexican border, he contends that § 1326 continues to disparately impact Mexican and Latino individuals.  [*Id.* at 36-39.]

The court's decision in *Rodriguez-Soto* is again instructive.  Though recognizing the repugnant racial reasons that motivated the enactment of the UAA, the court explained that Congress's motivations in 1929 had only limited probative value because over two decades passed between the enactment of the UAA and the INA and only thirty members of the 1929 Congress remained in office in 1952.

*Rodriguez-Soto*, 2022 WL 17852518, at *4 (citing *United States v. Santos-Reynoso*, No. 21-CR-268-LTS, 2022 WL 2274470, at *6 (S.D.N.Y. June 23, 2022) and *United States v. Viveros-Chavez*, No. 21 CR 665, 2022 WL 2116598, at *8 (N.D. Ill. June 13, 2022)).   The court also noted that "§ 1326 is not merely a reenactment of the UAA," rather "it is one provision in expansive legislation that resulted from 'a most intensive and searching investigation and study over a three year period.'"  *Id.* (quoting *United States v. Canals-Jiminez*, 943 F.2d 1284, 1287 (11th Cir. 1991)).

Significantly, *Rodriguez-Soto* is hardly an outlier.  In fact, with the exception of a district court decision in Nevada,[31] which the Ninth Circuit later reversed,[32] every court to address the arguments Mr. Valdovinos raises here has rejected them. *See, e.g., Barcenas-Rumualdo*, 53 F.4th at 865 n.15 (collecting cases); *Rodriguez-Soto*, 2022 WL 17852518, at *2 n.2 (collecting cases); *see also, e.g., United States v. Wence,* No. 22-2618, 2023 WL 5739844, at *1-3 (3d Cir. Sept. 6, 2023) (examining and following the Ninth Circuit's decision in *Carrillo-Lopez*).

---

[31] *United States v. Carrillo-Lopez*, 555 F. Supp. 3d 996, 1027 (D. Nev. 2021) (holding § 1326 unconstitutional under *Arlington Heights*).

[32] *United States v. Carrillo-Lopez*, 68 F.4th 1133, 1154 (9th Cir. 2023).

Against this backdrop, the Court addresses each of the arguments that Mr. Valdovinos puts forward as to why the enactment of the INA did not cleanse the racist taint of the UAA.  Starting with his contention that the 1952 Congress ignored the racial animus that motivated the enactment of the UAA, the Fifth Circuit rejected this very argument in *Barcenas-Rumualdo*, explaining that the court must "presume the legislature acted in good faith," and therefore cannot "take Congress's silence about the history of the UAA as evidence that it adopted any prior discriminatory intent."  *Barcenas-Rumualdo*, 53 F.4th at 866.  The Court additionally observed that "Congress has amended § 1326 multiple times since its enactment" and there is no suggestion that any of those amendments were adopted with racial animus.  *Id.*[33]

---

[33] Mr. Valdovinos cites the Supreme Court's decisions in *Ramos* and *Espinoza* for the proposition that "courts should examine the discriminatory motivations underlying a law at the time of its passage and that the taint of discriminatory purpose is not necessarily cleansed by mere reenactment of the law." [Doc. 21 at 32.]  *Ramos* and *Espinoza* are not helpful, however, as neither dealt with an equal protection challenge or relied on alleged discriminatory legislative motivations to invalidate the laws at issue.  *See Patterson*, 2023 WL 348970, at *4 n.1 (noting that "[e]ven the district court in *Carrillo-Lopez* concluded that dicta from the Supreme Court in *Ramos* and *Espinoza* 'was insufficient authority to justify relying solely on legislative history from the 1920s.'") (quoting *Carrillo-Lopez*, 555 F. Supp. 3d at 1020).  In *Ramos*, the issue was whether the Sixth Amendment right to jury trial requires a unanimous verdict to convict a defendant of serious criminal offense.  *Ramos*, 140 S.Ct. at 1394.  Critically, the Supreme Court held that a law permitting such convictions without unanimity would still violate the Sixth Amendment regardless of the motivations of the law.

The contemporaneous statements from President Truman and Deputy Attorney General Ford fare no better.  As to President Truman's statements, one court explained:

> First, President Truman was not a member of Congress who voted on the INA.  Second, President Truman opposed the INA, and courts have cautioned that statements by a bill's opponents are not probative of Congress's motives.  Third . . . President Truman's veto statement "tells the Court nothing about what [he] thought about § 1326 specifically" because his "full statement reveals that his concern with the INA [was mostly] about the INA's continued use of the quotas that disfavored immigrants from Asia and southern and eastern Europe, not with its treatment of immigrants from Latin America."

*United States v. Sanchez-Felix*, No. 21-CR-00310-PAB, 2021 WL 6125407, at *7 (D. Colo. Dec. 28, 2021) (quoting *United States v. Machic-Xiap*, No. 3:19-cr-407-SI, 2021 WL 3362738, *13 (D. Or. Aug. 3, 2021)); *see also Carrillo-Lopez*, 68 F.4th at 1148 (concluding that "President Truman's opposition to the national-origin quota system, the central reason for his veto, sheds no light on whether

_____

*Id.* at 1401 n.44.  Meanwhile, *Espinoza* involved a First Amendment challenge to a state law that excluded religiously-affiliated private schools from a state scholarship program, and the Court did not rely on a history of discrimination to invalidate the law.  *See generally*, 140 S. Ct. at 2251-2263.  Of course, this is not to say that the motivations of the 1929 Congress in enacting § 1326's precursor are completely irrelevant.  As discussed above, those motivations have some probative value—they just are not necessarily determinative.  *See Barcenas-Rumaldo*, 53 F.4th at 866 n.22 (stating that neither *Ramos* nor *Espinoza* support the proposition that "later reenactments do not cleanse the law of its original taint").

Congress had an invidious intent to discriminate against Mexicans and other Central and South Americans in enacting § 1326); *Barcenas-Rumualdo,* 53 F.4th at 867 ("President Truman's opinion on the INA is not probative of what Congress believed."). Likewise, Deputy Attorney General Ford's use of a racial epithet to describe the bill does not say anything about Congress's motivations because he was not a member of Congress. *Sanchez-Felix*, 2021 WL 6125407, at *7; *see also Carrillo-Lope*z, 68 F.4th at 1149 (concluding that Ford's comments were "attenuated" because they "shed no light on Congress's views").

Nor is the fact that some members of Congress referred to the INA as the "Wetback Bill" probative of Congress's motivation in passing the act. *Sanchez-Felix*, 2021 WL 6125407, at *7. Even granting "that some members of Congress may have had a racist motive in supporting the INA does not mean that Congress as a whole felt similarly." *Id.*; *accord United States v. Sorto-Munoz*, No. 4:21-CR-40155-01-KES, 2023 WL 3916296, at *3 (D.S.D. June 9, 2023) (declining to impute discriminatory beliefs of some members of Congress to the body as a whole even where some members used the slur "wetback" during discussions of the bill). "Congress's silence regarding the racially driven origins of the UAA cannot make up this deficit" of evidence that racial animus motivated the 1952 Congress to enact § 1326. *United States v. Patterson*, No. 3:21-CR-103 (VAB), 2023 WL 348970, at

74

*7 (D. Conn. Jan. 20, 2023); *see also Barcenas-Rumualdo,* 53 F.4th at 867 ("The fact that individual lawmakers dubbed a bill something derogatory, without more, says nothing of the motivations of Congress "as a whole" regarding the INA or § 1326 specifically.").

Because Mr. Valdovinos has not met his burden to prove that a discriminatory purpose was a motivating factor in the enactment of § 1326, "any disparate impact of the law is insufficient to carry the day." *Barcenas-Rumualdo*, 53 F.4th at 867; *see also Rodriguez-Soto*, 2022 WL 17852518, at *3 ("Even accepting that § 1326 has had a disparate impact on Latino individuals, the Court finds that Defendant's evidentiary proffers are "insufficient to establish under the *Arlington Heights* standard that discriminatory animus toward Hispanic peoples was a motivating factor in the enactment of Section 1326."). In other words, even if Mr. Valdovinos is correct that the vast majority of defendants in § 1326 cases identify as Mexican or Latino, his motion must be denied, even under heightened *Arlington Heights* scrutiny. *See Patterson*, 2023 WL 348970, at *8 (declining to address defendant's disparate impact arguments since the defendant failed to prove

that a discriminatory purpose motivated the enactment of § 1326).  It is therefore **RECOMMENDED** that the Motion to Dismiss be **DENIED**.[34]

## VI.   CONCLUSION

For all the reasons explained above, the Court **DENIES** Mr. Valdovinos's motion to disclose confidential informants [Doc. 24], and **RECOMMENDS** that the motion to dismiss [Doc. 21], the motion to suppress evidence [Doc. 25], the *Kastigar* Motion [Doc. 28], and the motion to suppress pole camera surveillance [Doc. 29] also be **DENIED.**

The undersigned has now ruled on all pretrial matters referred to me with respect to this defendant.  Accordingly, this case is **CERTIFIED READY FOR TRIAL**.

SO ORDERED and RECOMMENDED this 2nd day of February, 2024.

_____
JOHN K. LARKINS III
United States Magistrate Judge

---

[34] Mr. Valdovinos's request for an evidentiary hearing is also denied, as it is unnecessary to resolve the motion.  *See Patterson*, 2023 WL 348970, at *8 (declining to hold evidentiary hearing on substantively similar proffered facts).