# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

RIGOBERTO VALDOVINOS-
TAFOLLA,

      Defendant.

CRIMINAL ACTION FILE
NO. 1:23-CR-00359-WMR

## ORDER

This matter is before the Court on the Magistrate Judge's Order and Report and Recommendation ("R&R") [Doc. 45], which denied Defendant Rigoberto Valdovinos-Tafolla's Motion for Production of Name and Location of Confidential Informant(s) (the "Confidential Informant Motion") [Doc. 24] and recommends that Defendant's Motion to Dismiss [Doc. 21], Motion to Suppress [Doc. 25], Motion for *Kastigar* Hearing [Doc. 28], and Motion to Suppress Pole Camera Surveillance [Doc. 29] be denied. Also before the Court are Defendant's Objections to the R&R [Doc. 50]. Having considered the parties' evidence and having reviewed de novo the portions of the R&R objected to and the remainder for clear error, the Court adopts in part and rejects in part the R&R.

1

## I.      Background

The facts and procedural history of this case are set forth in the R&R and are incorporated by reference as if set forth fully herein. *See* [Doc. 45]. For the sake of clarity, however, the Court will summarize the pertinent procedural background. Defendant was first arrested in this District in June 2020 on a criminal complaint. *See U.S. v. Valdovinos-Tafolla*, No. 1:20-cr-292-WMR-JKL, Dkt. No. 1. Defendant waived indictment and was charged in a criminal information with one count of conspiracy to possess with intent to distribute methamphetamine. *Id.*, Dkt. Nos. 13–14. The Government subsequently indicted Defendant in November 2021 on three drug charges. *See United States v. Valdovino-Tafolla*, No. 1:21-cr-444-WMR-JKL (the "Previous Case"), Dkt. No. 1. However, this Court dismissed the Previous Case without prejudice under the Speedy Trial Act in October 2023. *Id.*, Dkt. No. 75. In November 2023, the Government commenced the instant case after it reindicted Defendant on two of the drug charges (Counts One and Two) and added an illegal re-entry charge (Count Three). *See* [Doc. 13].

Defendant filed, and the parties litigated, Defendant's Confidential Information Motion, Motion to Suppress, Motion for *Kastigar* Hearing, and Motion to Suppress Pole Camera Surveillance in the Previous Case, but the Court dismissed the Previous Case before ruling on the motions. Defendant has now renewed those motions [Docs. 24, 25, 28, and 29] and has filed the Motion to Dismiss [Doc. 21],

which relates to the newly indicted illegal re-entry charge. In his R&R, the Magistrate Judge denied the Confidential Informant Motion and recommends that the remaining motions be denied. *See* [Doc. 45]. Defendant has filed objections to the Magistrate Judge's analysis for each of his motions. [Doc. 50]. The Court proceeds to consider Defendant's objections to the R&R.

## II. Legal Standard

In reviewing the R&R, this Court makes a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). If a criminal defendant files timely objections to a magistrate judge's *order*, on the other hand, the Court must "modify or set aside any part of the order that is contrary to law or clearly erroneous." Fed. R. Crim. P. 59(a). "Parties filing objections to a magistrate's report and recommendation must specifically identify those findings objected to. Frivolous, conclusive, or general objections need not be considered by the district court." *United States v. Schultz*, 565 F.3d 1353, 1361 (11th Cir. 2009) (citations omitted). If no specific objections are made or no objections are made at all, "the appropriate standard of review for the report and recommendation is clear error." *Lattimore v. Bank of Am.*, N.A., 2014 WL 11456272, at *1 (N.D. Ga. Feb. 10, 2014), *aff'd sub nom. Lattimore v. Bank of Am. Home Loans*, 591 F. App'x 693 (11th Cir. 2015). Because Defendant has filed timely objections to the R&R in this case, the Court

3

reviews the challenged portions of the R&R de novo and the remainder of the R&R for clear error.

### III. Discussion

A. Confidential Informant Motion

After discovering that the Government used a confidential informant in its investigation, Defendant filed the Confidential Informant Motion, requesting that the Court issue an order requiring the Government to produce "the name, address, birthdate, telephone number, location and other identifying information concerning any informants in this case," as well as "any statements made by any person or persons who acted in such a capacity related to the charges in this case, [and] any relevant conduct." [Doc. 24 at 1]. The Government opposed the Motion, arguing that it did not need to identify the informant because it intends to call the informant to testify at trial. [Doc. 35 at 7–8]. Defendant did not dispute the substance of the Government's response; however, he requested for the first time in his reply brief that the Court order the Government to disclose the information "at least 30 days prior to trial to ensure that [Defendant] can obtain necessary information in order to cross-examine the witness." [Doc. 36 at 1].

The Magistrate Judge denied the Motion, finding that the Government's intention to call the informant to testify rendered "concerns surrounding the disclosure of [the] informant's identity . . . . generally inapplicable" under *Roviaro*

4

*v. United States*. [Doc. 45 at 4–5]; 353 U.S. 53 (1957). The Magistrate Judge further held that, even if the Government did not intend to call the informant to testify, Defendant had not shown a "direct relationship between his defense and the probable testimony of the informant" under *Roviaro*. [*Id.* at 6–7]. Finally, the Magistrate Judge denied Defendant's request to order the Government to disclose the informant's identity 30 days before trial because the Magistrate Judge did not find early disclosure appropriate and because Defendant raised the argument for the first time in his reply brief. [*Id.* at 6 n.3]. Defendant now objects to the Magistrate Judge's denial of the Motion, contending that "a deadline of 30 days prior to trial is necessary and appropriate in order to ensure that [Defendant] has sufficient time prior to trial" to obtain records necessary to cross-examine the informant. [Doc. 50 at 22–23].

The Court agrees with the Magistrate Judge's analysis and finds that the early disclosure Defendant requests is not warranted. Although *Roviaro* stands for the proposition that the Government's privilege to withhold the identity of confidential informants must yield in certain instances, *Roviaro* does not apply in this case because the Government intends to call the informant to testify at trial. *See Roviaro*, 353 U.S. at 60–61; *see also Banks v. Dretke*, 540 U.S. 668, 697 (2004) (emphasis in original) ("The issue of evidentiary law in *Roviaro* was whether (or when) the Government is obliged to reveal the identity of an undercover informer the Government does *not* call as a trial witness."); *U.S. v. Ruiz*, No. 1:21-CR-00426-

5

MLB-JEM, 2023 WL 3871721, at *2 (N.D. Ga. Mar. 27, 2023), report and recommendation adopted, No. 1:21-CR-00426-MLB, 2023 WL 3562970 (N.D. Ga. May 19, 2023) (collecting cases in this District holding that *Roviaro* does not apply when the Government intends to call the informant to testify at trial).

Instead, the general rule is that "[a] criminal defendant has no absolute right to a list of the government's witnesses in advance of the trial." *U.S. v. Johnson*, 713 F.2d 654, 659 (11th Cir. 1983). As the Government acknowledged in its brief, however, it is bound to disclose materials required by *Brady* and *Giglio* "in time for it to be put to effective use in cross examining witnesses at trial." *U.S. v. Najera-Perez*, No. 1:12-CR-232-2-CAP, 2014 WL 888651, at *28 (N.D. Ga. Mar. 6, 2014) (citing *Flores v. Satz*, 137 F.3d 1275, 1278–79 (11th Cir. 1998)); *see* [Doc. 35 at 8 n.2].[1] Accordingly, the Court does not find it necessary to order disclosure 30 days in advance of trial, and the Magistrate Judge did not err in so finding.

---

[1] The Court does not suggest, however, that the Government may withhold *Brady* information—including information that would impact the informant's credibility—until the eve of trial. Although the Court will not order disclosure 30 days before trial, the Government must timely disclose *Brady* information.

B. Motion to Suppress Evidence from Traffic Stop

Defendant's Motion to Suppress challenges the legality of a June 9, 2020, traffic stop and search of his vehicle, during which approximately $70,000 in alleged drug proceeds were seized. [Doc. 25]. The Magistrate Judge held an evidentiary hearing on the Motion and detailed the events underlying the Motion in the R&R. *See* [Doc. 27] (transcript of evidentiary hearing); [Doc. 45 at 8–17] (findings of fact related to the Motion to Suppress). In recommending that the Motion be denied, the Magistrate Judge concluded that the Clayton County Sheriff's Deputy that stopped Defendant, Deputy Patrick Kelly, had probable cause to stop and search Defendant's car through the "collective knowledge" doctrine and the automobile exception to the warrant requirement. [*Id.* at 17–28].

Defendant objects to the Magistrate Judge's finding that DEA Special Agent Hillar Moore ("SA Moore") and DEA Task Force Officer Brian Ballard ("TFO Ballard"), who were investigating Defendant, had a "minimal level of communication" with Deputy Kelly during the course of their investigation as required for the collective knowledge doctrine to apply. [Doc. 50 at 25]. Defendant further objects to the Magistrate Judge's interpretation of the testimony presented at the evidentiary hearing. [*Id.* at 25–27]. Specifically, Defendant claims that TFO Ballard's representation to Deputy Kelly that he had been "following" Defendant's vehicle, and his representation to Deputy Kelly that he had "just" witnessed

7

Defendant engage in a drug transaction, caused Deputy Kelly to mistakenly believe that TFO Ballard had been physically surveilling Defendant after the alleged drug transaction occurred. [*Id.*]. Defendant ultimately concludes that, because TFO Ballard was not physically following Defendant and because the alleged drug transaction had actually taken place some 30–90 minutes before Deputy Kelly stopped Defendant, the probable cause that Deputy Kelly needed to stop and search Defendant's car had dissipated. [*Id.*].

The Fourth Amendment protects persons "against unreasonable searches and seizures." U.S. Const. Amend. IV. A search conducted without a warrant issued upon probable cause is per se unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions. *Mincey v. Arizona*, 437 U.S. 385, 390 (1978) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). One of these is the so-called "automobile exception," which provides that a warrantless search of an automobile is constitutional if (1) the automobile is readily mobile and (2) there is probable cause to believe that it contains contraband or evidence of a crime. *United States v. Lanzon*, 639 F.3d 1293, 1299–1300 (11th Cir. 2011) (citing *United States v. Watts*, 329 F.3d 1282, 1286 (11th Cir. 2003)). The first prong is satisfied if the car is operational, which is not contested in this case. *Watts*, 329 F.3d at 1286 (citation omitted).

8

Probable cause exists "when under the totality-of-the-circumstances there is a fair probability that contraband or evidence of a crime will be found in a particular place." *U.S. v. Franklin*, 694 F.3d 1, 7 (11th Cir. 2012) (quoting *U.S. v. Tobin*, 923 F.2d 1506, 1510 (11th Cir. 1991)). "A 'fair probability,' in turn exists when the facts and circumstances would lead a reasonably prudent person to believe that the place to be searched contains contraband or evidence of a crime." *U.S. v. Lopez*, 649 F.3d 1222, 1245 (11th Cir. 2011) (quoting *U.S. v. Alexander,* 835 F.2d 1406, 1409 (11th Cir.1988)). "Probable cause requires more than mere suspicion, but does not require convincing proof." *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998) (quoting *Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty.*, 956 F.2d 1112, 1120 (11th Cir. 1992)); *see Davis v. City of Apopka*, 78 F.4th 1326, 1334 (11th Cir. 2023) (quoting *Paez v. Mulvey*, 915 F.3d 1276, 1286 (11th Cir. 2019)) (emphasis in original) ("Probable cause 'does not require anything close to conclusive proof or proof beyond a reasonable doubt that a crime was in fact committed, *or even a finding made by a preponderance of the evidence*.'").

In deciding whether probable cause existed for a search, "this Court may look to the collective knowledge of the law enforcement officials involved in an investigation 'if they maintained at least a minimal level of communication during their investigation.'" *U.S. v. Andres*, 960 F.3d 1310, 1317 (11th Cir. 2020) (quoting *U.S. v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985)); *see also U.S. v. Allison*, 953

F.2d 1346, 1350 (11th Cir. 1992) ("Where there is at least minimal communication between different officers, the collective knowledge of the officers determines probable cause."). "Probable cause exists where the facts within the collective knowledge of law enforcement officials, derived from reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that a criminal offense has been or is being committed." *Gates v. Khokhar*, 884 F.3d 1290, 1298 (11th Cir. 2018) (quoting *Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010)).

In his objections, Defendant first argues that the collective knowledge doctrine does not apply because SA Moore and TFO Ballard did not have a "minimal level of communication" with Deputy Kelly during their investigation. [Doc. 50 at 25]. However, even if Deputy Kelly's communication with the investigating officers was limited to one phone call with TFO Ballard, the requirement for a "minimal level of communication" is satisfied. When presented with facts similar to those in this case, the Eleventh Circuit has consistently affirmed district courts' applications of the collective knowledge doctrine. *See U.S. v. Kapperman*, 764 F.2d 786, 791 n. 5 (11th Cir. 1985) (holding that an arresting officer was entitled to act on a radio communication to "stop the vehicle and secure the scene" even if he "may not have known all of the facts already uncovered in the investigation"); *U.S. v. Williams*, 876 F.2d 1521, 1523–24 (11th Cir. 1989) (affirming district court's denial of a motion to

suppress where detective told officer to stop car and identify driver and said that the stop "was part of a drug investigation but did not give the officer any more specific information"); *U.S. v. Sullivan*, 717 F. App'x 946, 948–50 (11th Cir. 2017) (affirming district court's denial of a motion to suppress where investigating officer called an officer in another jurisdiction to coordinate a traffic stop). Accordingly, the Court finds that there was a sufficient level of communication between Deputy Kelly and TFO Ballard for the collective knowledge doctrine to apply.

Without citing any authority, Defendant next objects to the Magistrate Judge's "interpretation of the testimony at the suppression hearing . . . ." [Doc. 50 at 25]. Defendant appears to object that the Magistrate Judge did not properly consider testimony about what Deputy Kelly believed based on his conversation with TFO Ballard before searching Defendant's car. For example, Defendant argues that Deputy Kelly's testimony indicated that he subjectively believed that TFO Ballard had been physically following Defendant's car and that the alleged drug transaction had occurred "nearly immediately" before TFO Ballard called him. [*Id.* at 25–26].

However, Deputy Kelly's subjective beliefs are not relevant to the existence of probable cause (or lack thereof). "Probable cause issues are to be decided on an objective basis by courts without regard to the subjective beliefs of law enforcement officers, whatever those beliefs may have been." *Craig v. Singletary*, 127 F.3d 1030, 1042 (11th Cir. 1997). Thus, the Court makes the probable cause determination

"objectively, and not by the subjective conclusions of the law enforcement officer." *U.S. v. Roy*, 869 F.2d 1427, 1432 (11th Cir. 1989). Accordingly, what Deputy Kelly may or may not have believed is immaterial to the Court's analysis, and the Magistrate Judge did not err by failing to discuss Deputy Kelly's subjective beliefs.

Defendant's final objection, which he also fails to support with citations to authority, is that any probable cause that officers had dissipated by the time Deputy Kelly stopped Defendant. [Doc. 50 at 26–27]. Defendant argues that, because officers did not physically surveil him after he allegedly participated in the drug transaction, it would have been possible for him to "divest[] himself of any evidence of any crimes . . . . And if that were the case, there would not be probable cause to stop the vehicle." [*Id.*].

Before turning to the issue of dissipated or "stale" probable cause, the Court first finds, for the reasons the Magistrate Judge discussed in the R&R, that officers had probable cause to search Defendant's car under the automobile exception when Defendant exited the parking lot where the alleged drug transaction occurred. *See* [Doc. 45 at 17–28]. The Court has already overruled Defendant's other objections to the Magistrate Judge's probable cause analysis, and the Court agrees with the Magistrate Judge's opinion as to applicability of the collective knowledge doctrine and the overwhelming evidence that officers had to establish probable cause when

Defendant exited the parking lot.[2] Having adopted the Magistrate Judge's analysis as to the existence of probable cause when Defendant exited the parking lot, the only remaining issue is whether probable cause had grown stale by the time Deputy Kelly stopped Defendant, which is an issue that the Magistrate Judge did not directly address.

Defendant did not cite any authority to support his probable cause dissipation theory, and after performing independent research, the Court has not found any controlling authority dealing specifically with dissipation of probable cause for a search pursuant to the automobile exception. However, there are many cases that deal with the closely related issue of "staleness" of probable cause for search warrants. The "staleness doctrine in the context of probable cause . . . requires that the information supporting the government's application for a warrant must show that probable cause exists at the time the warrant issues." *U.S. v. Bervaldi*, 226 F.3d 1256, 1264 (11th Cir. 2000). Similarly, when officers conduct a search pursuant to the automobile exception, they must have probable cause at the time of the search to

---

[2] In finding that officers had probable cause to search Defendant's car, the Magistrate Judge listed nine categories of evidence that officers had gathered against Defendant. *See* [Doc. 45 at 26–27]. The final three categories involve evidence that officers gathered after Defendant exited the parking lot where the alleged drug transaction took place. However, even setting aside these final three categories, the Court still finds that officers had overwhelming evidence that established probable cause to search Defendant's car when he exited the parking lot.

believe that the vehicle contains contraband or evidence of a crime. *See U.S. v. Lanzon*, 639 F.3d 1293, 1300 (11th Cir. 2011).

In determining whether information is stale for a search warrant, "[c]ourts consider 'the length of time' as well as 'the nature of the suspected crime (discrete crimes or ongoing conspiracy), habits of the accused, character of the items sought, and nature and function of the premises to be searched.'" *U.S. v. Touset*, 890 F.3d 1227, 1238 (11th Cir. 2018) (quoting *Bervaldi*, 226 F.3d at 1265). "There is no particular rule or time limit for when information becomes stale. Rather, 'staleness is an issue which must be decided on the peculiar facts of each case.'" *Bervaldi*, 226 F.3d at 1265 (citations omitted) (quoting *U.S. v. Bascaro*, 742 F.2d 1335, 1345 (11th Cir. 1984)).

The Court finds the Eleventh Circuit's staleness analysis instructive in this closely related context and applies it here. The testimony from the suppression hearing indicates that Defendant arrived at the parking lot where the alleged drug transaction occurred sometime between 7:00 and 8:00pm, TFO Ballard called Deputy Kelly at approximately 8:30pm, and Deputy Kelly stopped Defendant between 8:50 and 9:00pm. [Doc. 27 at 24, 63]. Thus, at the most, two hours had elapsed between the time Defendant left the parking lot and when he was stopped by Deputy Kelly. Although it may have been possible for Defendant to rid his vehicle

of incriminating evidence during this period,[3] this brief delay was hardly enough time to cause a reasonably prudent person to believe that Defendant's car no longer contained contraband or evidence of a crime. *See U.S. v. Lopez*, 649 F.3d 1222, 1245 (11th Cir. 2011). This is especially true considering that the other individual involved in the alleged drug transaction fled from officers and threw a substance testing positive for methamphetamine out of their vehicle shortly before Deputy Kelly stopped Defendant. [Doc. 27 at 26–27].

The Court also finds that the nature of the criminal activity supports a finding that probable cause had not grown stale. *See Touset*, 890 F.3d at 1238. "When criminal activity is protracted and continuous, it is more likely that the passage of time will not dissipate probable cause." *U.S. v. Domme*, 753 F.2d 950, 953 (11th Cir. 1985). In this case, the DEA consistently gathered incriminating evidence against Defendant for approximately 21 months before his arrest in June 2020. [Doc. 27 at 12]. The prolonged nature of Defendant's alleged criminal activity supports that there was at least a "fair probability" that evidence of his crimes would be found in his vehicle. *U.S. v. Franklin*, 694 F.3d 1, 7 (11th Cir. 2012) (quoting *U.S. v. Tobin*, 923 F.2d 1506, 1510 (11th Cir. 1991)); *see U.S. v. Johnson*, 290 F. App'x 214, 223 (11th Cir. 2008) (finding that two drug transactions occurring five days apart

---

[3] Considering that drug traffickers typically deal with expensive materials—namely, drugs and cash—the Court finds it unlikely that he would have done so without some indication that he was being actively pursued by law enforcement.

suggested the "continuous nature of the criminal activity"); *U.S. v. Bascaro*, 742 F.2d 1335, 1346 (11th Cir. 1984) ("Protracted and continuous activity is inherent in large-scale drug trafficking operations."). For these reasons, the Court finds that probable cause had not dissipated or grown stale by the time Deputy Kelly searched Defendant's car.

C. Motion to Suppress Pole Camera Surveillance

Defendant's Motion to Suppress Pole Camera Surveillance seeks to suppress footage from a pole camera that surveilled the outside of a house in Rex, Georgia, which the Government alleges Defendant visited for drug trafficking purposes (the "Rex House"). *See generally* [Doc. 29]; [Doc. 27 at 14]. In recommending that the Motion be denied, the Magistrate Judge found that Defendant lacked standing to challenge the pole camera evidence because he did not have a reasonable expectation of privacy in either the Rex House or in his personal movements around the Rex House. [Doc. 45 at 58–59]. The Magistrate Judge further found that the use of the pole camera did not constitute a search under the Supreme Court's opinion in *Carpenter v. U.S.* 585 U.S. 296 (2018); [Doc. 45 at 59–65]. Defendant objects that the use of the pole camera did constitute a search, that he has standing to challenge that search, and that the Court should conduct a hearing to determine the pole camera's capabilities. [Doc. 50 at 27–31].

16

###### i.    Standing

The Fourth Amendment protects individuals against unreasonable searches of "their persons, houses, papers, and effects." U.S. Const. Amend. IV. "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *U.S. v. Jacobsen*, 466 U.S. 109, 113 (1984). Moreover, because the Fourth Amendment confers a personal right, it must be invoked by an individual who has standing to challenge a search. *Minnesota v. Carter*, 525 U.S. 83, 88 (1998). "To have Fourth Amendment standing to challenge a search, a person must have a reasonable expectation of privacy in the place searched." *U.S. v. Cohen*, 38 F.4th 1364, 1368 (11th Cir. 2022) (citing *Carter*, 525 U.S. 83, 88 (1998)). To prove that he had a reasonable expectation of privacy, the individual alleging an unconstitutional search must show that he had both a subjective and objective expectation of privacy. *U.S. v. Segura-Baltazar*, 448 F.3d 1281, 1286 (11th Cir. 2006). "The subjective component requires that a person exhibit an actual expectation of privacy, while the objective component requires that the privacy expectation be one that society is prepared to recognize as reasonable." *Id.* (quoting *U.S. v. Robinson*, 62 F.3d 1325, 1328 (11th Cir. 1995)).

Beginning with standing, the Court finds that Defendant did not have a reasonable expectation of privacy in his personal movements around the Rex House to challenge any search that may have occurred. The pole camera in this case

captured Defendant's movements outside of the Rex House, which were free for any neighbor or passerby to see. *See* [Doc. 27 at 15]. Defendant's publicly exposed personal movements outside of the Rex House fall squarely outside the Fourth Amendment's protections. *See Katz v. U.S.*, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."); *see also U.S. v. Santana*, 427 U.S. 38, 42 (1976) (holding that a woman standing in the doorway of her house was in a "public place" because she was "exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house"). Thus, Defendant does not have standing to challenge pole camera footage that captured his publicly exposed movements outside of the Rex House.

Defendant similarly had no reasonable expectation of privacy in the Rex House itself. To establish an expectation of privacy in the Rex House, Defendant must demonstrate "an unrestricted right of occupancy or custody and control of the premises as distinguished from occasional presence on the premises as a mere guest or invitee." *U.S. v. Baron-Mantilla*, 743 F.2d 868, 870 (11th Cir. 1984) (quoting *U.S. v. Bachner*, 706 F.2d 1121, 1126 n.6 (11th Cir. 1983)). Here, the evidence indicates that Defendant did not live in the Rex House and had only an "occasional presence" there. *Id.* SA Moore specifically testified that Defendant had a "primary residence

[in Alpharetta, Georgia,] where he spent nighttime hours," but that Defendant only "infrequently visit[ed]" the Rex House. [Doc. 27 at 13–14].

Moreover, the lease for the Rex House was signed by "Ivan Baldovinos," not Defendant. [Doc. 34 at 6]; [Doc. 50 at 29]; *see U.S. v. Campbell*, 434 F. App'x 805, 810 (11th Cir. 2011) (per curiam) (holding that the defendant did not have standing to challenge the search of a house where he did not live and which he did not lease). Defendant contends that the name "Ivan Baldovinos" is similar to Defendant's name, Rigoberto Valdovinos-Tafolla, "which strongly suggests that [Defendant] had signed the lease for the house." [Doc. 50 at 29–30]. However, Defendant has not alleged or represented to the Court, even if granted the hearing he requests, that he could produce evidence or elicit testimony to corroborate the theory that Defendant was, in fact, the "Ivan Baldovinos" who signed the lease. The Court declines to act on suggestions unsupported by evidence or by a representation that such evidence could be produced. *See U.S. v. Richardson*, 764 F.2d 1514, 1527 (11th Cir. 1985) ("A motion to suppress must in every critical respect be sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented.").

Finally, Defendant does not have standing to challenge searches occurring in the Rex House simply because he was the only person that SA Moore observed entering the residence. *See* [Doc. 50 at 29]; [Doc. 27 at 14]. Instead, Defendant must

establish "an unrestricted right of occupancy or custody and control of the premises," which is simply inconsistent with his occasional presence at the Rex House as a non-resident and non-lessee. *U.S. v. Baron-Mantilla*, 743 F.2d 868, 870 (11th Cir. 1984) (quoting *U.S. v. Bachner*, 706 F.2d 1121, 1126 n.6 (11th Cir. 1983)) (holding that the defendant did not have a reasonable expectation of privacy in an apartment that he did not own or rent, even though he had a key to the apartment). Accordingly, the Court finds that Defendant does not have standing to challenge any searches that may have occurred at the Rex House.

### ii.    *Pole Camera Surveillance and Denial of Hearing*

Even if Defendant had standing to challenge a search occurring in or around the Rex House, his Motion to Suppress would nevertheless fail because no Fourth Amendment search occurred in the first instance. The Supreme Court's opinion in *Carpenter v. United States*, which Defendant relies on, does not alter this result. 585 U.S. 296 (2018); *see* [Doc. 29 at 2–8]; [Doc. 38 at 4–7]; [Doc. 50 at 30–31]. The Magistrate Judge discussed the *Carpenter* case in detail, see [Doc. 45 at 59–65], which held that the retrospective collection of cell-site location information ("CSLI") constituted a search under the Fourth Amendment. *See* 585 U.S. at 300–03. However, the *Carpenter* opinion is inapplicable to this case by its own terms, as the Supreme Court reiterated that its decision was a "narrow one" applying only to "real-time CSLI or 'tower dumps.'" *Id.* at 316 (emphasis added) (stating that the

holding does not "call into question conventional surveillance techniques and tools, *such as security cameras*").

Moreover, when determining whether using a pole camera to capture publicly exposed activities constitutes a search under *Carpenter*, Courts in the Eleventh Circuit have uniformly found that it does not. *See U.S. v. Flores*, No. 1:19-CR-364-MHC-JSA, 2021 WL 1312583, at *8 (N.D. Ga. Apr. 8, 2021); *U.S. v. Fanning*, No. 1:18-CR- 362-AT-CMS, 2019 WL 6462830, at *3 (N.D. Ga. May 28, 2019), *report and recommendation adopted*, 2019 WL 3812423 (N.D. Ga. Aug. 13, 2019); *U.S. v. Gbenedio*, No. 1:17-CR-430-TWT-JSA, 2019 WL 2177943, at *3 (N.D. Ga. Mar. 29, 2019), *report and recommendation adopted*, 2019 WL 2173994 (N.D. Ga. May 17, 2019); *U.S. v. Bronner*, No. 3:19-CR-109-J-34JRK, 2020 WL 3491965, at *22 (M.D. Fla. May 18, 2020), *report and recommendation adopted*, 2020 WL 3490192 (M.D. Fla. June 26, 2020).[4] The Magistrate Judge articulated the distinguishing feature between CSLI in *Carpenter* and pole cameras like the one used in this case:

> [H]istorical CSLI that comprehensively captures an individual's movements, both public and private, over an extended period is categorically different than a single pole camera that captured images of a single, fixed location—here, the front of the Rex house and

---

[4] The same goes for the majority of courts outside of the Eleventh Circuit. *See U.S. v. Flores*, 1:19-CR-389-LMM-CCB-15, 2022 WL 19828971, at *17 (N.D. Ga. Nov. 17, 2022), *report and recommendation adopted in relevant part*, 2023 WL 3095566, *2 (N.D. Ga. Apr. 26, 2023) (collecting out-of-circuit cases finding *Carpenter* inapplicable to pole cameras).

driveway—and only "infrequently" filmed [Defendant] entering or exiting.

[Doc. 45 at 64].

*Carpenter* aside, the Court is constrained by the fact that the pole camera captured Defendant's publicly exposed movements, which fall outside the Fourth Amendment's protections. *See Katz v. U.S.*, 389 U.S. 347, 351 (1967) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."). This is true no matter how technologically advanced the pole camera was, and, as a result, there is no need to hold a hearing to determine the camera's capabilities. *See U.S. v. Cooper*, 203 F.3d 1279, 1285 (11th Cir. 2000) (quoting *U.S. v. Sneed*, 732 F.2d 886, 888 (11th Cir. 1984)) ("Where a defendant in a motion to suppress fails to allege facts that if proved would require the grant of relief, the law does not require that the district court hold a hearing independent of the trial to receive evidence on any issue necessary to the determination of the motion."). For these reasons, the Court finds that Defendant's Motion to Suppress and request for a hearing to determine the pole camera's capabilities should be denied.

D. Motion for *Kastigar* Hearing

    i.    *Factual Background*

Defendant's Motion for *Kastigar* Hearing relates to a proffer session that occurred on June 22, 2020, which was attended by Defendant, Defendant's attorney, SA Moore, AUSA Miguel Acosta, TFO Ballard, TFO Andy Cross, and a Spanish translator (the "Proffer Session"). [Doc. 28 at 17]. In connection with the Proffer Session, Defendant and Defendant's attorney executed a letter agreement containing the following terms:

1. The United States Attorney's Office for the Northern District of Georgia ("the Government") requires complete and truthful statements of your client, with no material misstatements or material omissions of fact. No information provided by you or your client to the Government during the proffer session will be used against him in the grand jury or in the Government's case-in-chief (subject to the terms set forth below). Likewise, no statements made by your client during the proffer session will be used against your client to increase his Sentencing Guidelines offense level in the pending case (subject to the terms set forth below). Crimes of violence are excluded from the terms of this agreement.

2. The Government is completely free to pursue any and all investigative leads derived in any way from the proffered information, which could result in the acquisition of evidence admissible against your client in subsequent proceedings.

3. If your client (or you on behalf of your client) subsequently takes a position in any legal proceeding that is inconsistent with the proffered information – whether in pleadings, oral argument, opening statement, witness testimony, documentary evidence,

questioning of witnesses, at a sentencing hearing, or in any other manner – the Government may use your client's proffered statements (and all evidence obtained directly or indirectly therefrom) in any responsive pleading and argument, for cross-examination, impeachment, or rebuttal evidence, and as affirmative evidence in the Government's case-in-chief. The Government may also use statements made by your client in the proffer session(s) to respond to arguments made or issues raised *sua sponte* by the Magistrate or District Court. . . .

. . .

6. In agreeing to provide a proffer to the Government, your client agrees that the use of any statements or information provided by him/her shall be governed by the terms and conditions set forth in this letter agreement. Furthermore, your client waives any right to challenge the admissibility of any such statements or information under Federal Rule of Criminal Procedure 11 and Federal Rule of Evidence 410.

(the "Proffer Agreement") [Doc. 28 at 14–15].

According to a DEA Report of Investigation, during the Proffer Session, Defendant consented to a search of three phones that were seized during his arrest, executed a DEA-88a Consent to Search Form for the phones, and provided the passwords to access the phones' contents. *See* [*Id.* at 17] (Report of Investigation). Defendant also provided information confirming that he (1) operated a clandestine methamphetamine lab at the Rex House; (2) received liquid methamphetamine in gas tanks; (3) communicated with at least one other "cook" on how to produce

methamphetamine; and (4) on the day of his arrest, delivered several pounds of methamphetamine to two different individuals. [*Id.* at 17–18].

After the Proffer Session, Defendant was indicted in the Previous Case for production and distribution of methamphetamine. *United States v. Valdovino-Tafolla*, No. 1:21-cr-444-WMR-JKL, Dkt. No. 1. However, the Previous Case was dismissed, and the Government subsequently presented its case to a new grand jury. *See* [Doc. 43 at 16–29] (Grand Jury Transcript). Before the new grand jury, SA Moore testified about the events leading to Defendant's arrest that law enforcement observed. [*Id.*] He testified as follows:

- On September 23, 2018, a DEA Confidential Source delivered approximately 160 pounds of MSM to Defendant. [*Id.* at 20].
- In July 2019, a DEA Confidential Source delivered about 20 pounds of MSM to Defendant. [*Id.* at 20–21].
- In March 2020, SA Moore obtained a GPS ping warrant for Defendant's phone, which revealed Defendant frequented the Rex House, but he did not appear to live there and did not stay there overnight. Agents also observed him bringing items into the residence they knew were frequently used in clandestine methamphetamine production. [*Id.* at 21].
- Agents were able to determine that, while Defendant lived in Alpharetta, he traveled to the Rex House several times a week. [*Id.*].
- In April 2020, agents observed Defendant bringing buckets, bins, fans, gas tanks, muriatic acid, and pH test kits into the Rex House. [*Id.* at 22].
- On June 8, 2020, agents observed Defendant go to Home Depot and purchase muriatic acid, and then later that day bring marine-style gas tanks into the Rex House. [*Id.* at 22–23].
- On June 9, 2020, agents conducting surveillance of Defendant observed him go to a convenience store near the Rex House and buy 14

Tupperware containers. Agents then saw him remove the containers from their packaging, discard the tops, and take the containers to the Rex House. [*Id.* at 23].

- At around 8:00 p.m. on June 9, 2020, agents conducting pole camera surveillance saw Defendant exit the Rex House with two large Home Depot style cardboard boxes and place them into his vehicle. Defendant then drove to a Lowe's shopping center. SA Moore, who was parked at the shopping center, observed Defendant park in a remote part of the lot. A short time later, SA Moore saw a black truck pull up next to Defendant, after which Defendant got out of his vehicle, removed one of the boxes from the back of his car, and placed it in the back of the truck. The truck and Defendant then went their separate ways. [*Id.* at 24].

- The agents followed the truck and saw its driver throw a cardboard box and a white powdery substance out of the window. The substance tested positive for methamphetamine. The agents also seized a Tupperware container that did not have a lid, which was consistent with the containers Defendant had purchased earlier in the day. The driver of the truck was arrested. [*Id.* at 24–25].

- The agents did not follow Defendant because they were able to electronically track his location. Defendant was pulled over and arrested later that evening. A search of his car yielded about $70,000 in U.S. currency, but the other cardboard box that the agents saw Defendant place into the car was not found there. [*Id.* at 25–26].

- Agents then executed a search warrant for the Rex House, where they seized around 1.285 kilograms of methamphetamine in a Tupperware container; three igloo-sized containers that contained a substance that tested positive for crystal meth; a large stovetop pot containing two gallons of what field-tested positive for as liquid methamphetamine; one five-gallon bucket of an oily substance that tested positive for liquid methamphetamine; and numerous items consistent with a clandestine methamphetamine lab including box fans, drying bins, igloo containers,

pots, pans, pH test kits, MSM, muriatic acid, and acetone. [*Id.* at 26–27].

As to the illegal re-entry count, SA Moore testified concerning Defendant's immigration history, including that he was a Mexican citizen, that he had been removed from the United States on three prior occasions, and that he had re-entered the United States in Laredo, Texas without permission. [*Id.* at 27–28].

ii.     The Kastigar *Motion and Procedural Background*

Defendant's Motion for *Kastigar* Hearing requests that the Court conduct a hearing to determine the extent to which the Government's case "has been tainted by its impermissible use of [Defendant's] immunized statements" related to the Proffer Session. [Doc. 28 at 1]. If the Court determines that the Government has impermissibly used Defendant's immunized statements before the grand jury, the Motion further requests that the Court either "(1) dismiss the indictment as tainted by the violation of [Defendant's] Fifth Amendment rights; or (2) exclude from trial all evidence derived, either directly or indirectly, from the violation of [Defendant's] Fifth Amendment rights." [*Id.*].

Before the Magistrate Judge, the parties argued primarily about the scope of immunity provided by the Proffer Agreement and the admissibility of the contents of the phones that Defendant supplied passcodes for during the Proffer Session. *See generally* [Doc. 28]; [Doc. 30]; [Doc. 31]. As it relates to the scope of the Proffer Agreement, the Magistrate Judge concluded that the Proffer Agreement provided

27

direct use immunity but not derivative use immunity, meaning that the Government is prohibited, both before the grand jury and in its case-in-chief, from relying on evidence that Defendant provided directly during the Proffer Session but not evidence derived indirectly from the proffered information. [Doc. 45 at 38–50]. With regard to the admissibility of the phones' contents, the Magistrate Judge concluded that the phones' contents were derivative evidence and that, thus, the Government could rely on their contents before the grand jury and in its case-in-chief. [*Id.* at 52–54]. The Magistrate Judge ultimately recommended that Defendant's requests for a *Kastigar* hearing and for dismissal of the indictment be denied. [*Id.* at 50–52, 55–56]. Defendant has objected to each of these findings. *See* [Doc. 50 at 4–22].

### iii.    The Scope of the Proffer Agreement

"Due process requires the government to adhere to the terms of any plea bargain or immunity agreement it makes." *U.S. v. Hill*, 643 F.3d 807, 874 (11th Cir. 2011) (quoting *U.S. v. Harvey*, 869 F.2d 1439, 1443 (11th Cir. 1989)). "This is true because . . . by testifying under a grant of immunity[, a defendant] forgoes his fifth amendment privilege." *Harvey*, 869 F.2d at 1444. "[B]ecause due process requires [the Court] to enforce the government's agreement . . . [it must] apply the same rules and method of analysis to an informal grant of use or transactional immunity as [it] would to a formal grant" through statutory immunity. *Id.*

In this case, Defendant's immunity stems from the Proffer Agreement. Thus, the Court "must look to and, if necessary, interpret the text of the agreement" to determine the scope of his immunity. *Hill*, 643 F.3d at 875. "The construction of proffer agreements . . . is governed generally by the principles of contract law," and the "agreement should be viewed 'against the background of the negotiations.'" *U.S. v. Pielago*, 135 F.3d 703, 709 (11th Cir. 1998) (quoting *In re Arnett*, 804 F.2d 1200, 1203 (11th Cir. 1986)). "Any ambiguities in the terms of a proffer agreement should be resolved in favor of the criminal defendant." *Pielago*, 135 F.3d at 709–10.

Here, the Court agrees with the Magistrate Judge's interpretation of the Proffer Agreement and conclusion that it immunizes only that evidence which Defendant communicated during the Proffer Session. The first paragraph of the Proffer Agreement, which the Court refers to as the "Immunity Provision," provides in relevant part that: "No information provided by you or your client to the Government *during the proffer session* will be used against him in the grand jury or in the Government's case-in-chief (subject to the terms set forth below)." [Doc. 28 at 14] (emphasis added). By unambiguously immunizing only "information provided . . . during the proffer session," the Immunity Provision provides only direct use immunity. [*Id.*]. Stated differently, nothing in the Immunity Provision suggests that the Government would be prohibited from acting on the "information

provided . . . during the proffer session" to gather additional (derivative) evidence that could be introduced against Defendant before the grand jury or at trial. [*Id.*].

The second paragraph of the Proffer Agreement, which the Court refers to as the "Investigative Leads Provision," provides in relevant part that: "The Government is completely free to pursue any and all investigative leads derived in any way from the proffered information, which could result in the acquisition of evidence admissible against your client in subsequent proceedings." [*Id.*]. This provision's unambiguous language simply confirms what is not written explicitly in the Immunity Provision: that derivative evidence obtained by the Government based on proffered information is generally admissible. Thus, after reading the Immunity and Investigative Leads Provisions together, it is clear that the only evidence that has been immunized is that which Defendant "provided . . . during the proffer session." [*Id.*].

Finally, the third paragraph of the Proffer Agreement, which the Court refers to as the "Exception Provision," provides in relevant part: "If your client (or you on behalf of your client) subsequently takes a position in any legal proceeding that is inconsistent with the proffered information . . . the Government may use your client's proffered statements (and all evidence obtained directly or indirectly therefrom) in any responsive pleading and argument, for cross-examination, impeachment, or rebuttal evidence, and as affirmative evidence in the Government's

case-in-chief." [*Id.*]. This provision is also unambiguous, and it provides an exception to the only immunity that is bestowed by the provisions preceding it: direct use immunity. In other words, the Exception Provision modifies the Immunity Provision, which is the only immunity-granting provision in the Proffer Agreement. Accordingly, the Proffer Agreement provides only direct use immunity—as set forth in the Immunity Provision and clarified in the Investigative Leads Provision—to which an exception applies if Defendant "subsequently takes a position in any legal proceeding that is inconsistent with the proffered information." [*Id.*].

Defendant argues that the Proffer Agreement is ambiguous because "it provides [in the Investigative Leads Provision] that the government may pursue investigatory leads, but in [the Exception Provision], it also limits when that evidence can be admitted." [Doc. 50 at 7]. Thus, according to Defendant, there are two ways to read the Proffer Agreement: "(1) that the agreement allows the government to pursue investigative leads from the immunized information but that the evidence would be admitted against [Defendant] only in specific circumstances; or (2) that the government may pursue investigative leads and use the derivative evidence whenever it chooses to do so." [*Id.* at 9].

However, Defendant attempts to read ambiguity into the Proffer Agreement where no ambiguity exists. As discussed, the Exception Provision modifies only the Immunity Provision, not the Investigatory Leads Provision. The Investigatory Leads

Provision stands alone, and it does not provide Defendant with any substantive right that the Exception Provision could modify. As the Magistrate Judge explained it, the Investigatory Leads Provision simply declares "that evidence derived from [Defendant's] immunized statements may be obtained and then admitted—that is, *used as evidence*—during subsequent proceedings." [Doc. 45 at 46] (emphasis in original). Or, in Defendant's words, the Investigatory Leads Provision provides "that the government may pursue investigative leads and use the derivative evidence whenever it chooses to do so." [Doc. 50 at 9].

To the extent Defendant argues that the Proffer Agreement is ambiguous because of the Exception Provision's parenthetical language, "all evidence obtained directly or indirectly therefrom," the Court disagrees. [Doc. 28 at 14]. In context, the language at issue provides: "If your client (or you on behalf of your client) subsequently takes a position in any legal proceeding that is inconsistent with the proffered information . . . the Government may use your client's proffered statements *(and all evidence obtained directly or indirectly therefrom)*" in certain specified circumstances. [*Id.*] (emphasis added). However, given that the Immunity Provision provides only direct use immunity, and given that the Investigatory Leads Provision declares derivative evidence generally admissible, it would be unreasonable to read the above-quoted parenthetical to completely nullify the provisions preceding it, as Defendant argues. *See CNH Indus. N.V. v. Reese*, 583

U.S. 133, 134 (2018) (emphasis added) ("A contract is not ambiguous unless it is subject to more than one *reasonable* interpretation[.]"). Instead, the Court finds the only reasonable way to interpret the parenthetical language is that it clarifies that, if Defendant takes a position inconsistent with the proffered information, the Government may—as it may in all other instances—introduce affirmative derivative evidence against Defendant. Stated differently, the parenthetical simply spells out that the general rule regarding *derivative* evidence (that it is admissible) stands even when an *exception* to the general rule regarding *direct* evidence (that it is not admissible) applies. *See Becerra v. Empire Health Found., for Valley Hosp. Med. Cent.*, 597 U.S. 424, 440 (2022) (quoting *Boechler, P.C. v. Comm'r of Internal Revenue*, 596 U.S. 199, 206 (2022)) ("[A] parenthetical is 'typically used to convey an aside or afterthought.'").

Defendant relies on the Eleventh Circuit's opinion in *U.S. v. Hill* to argue that the Proffer Agreement provides both direct and derivative use immunity, but the language of the proffer agreement in that case is materially different from the language in the instant Proffer Agreement. *See* [Doc. 50 at 5–8]; 643 F.3d 807 (11th Cir. 2011). In *Hill*, the proffer agreement's immunity provision stated that "*[a]nything related to the proffer* cannot and will not be used against [the defendant] in any Government case-in-chief." *Hill*, 643 F.3d at 875 (emphasis added). That immunity-granting language, which the Eleventh Circuit called "broad" and found

to include derivative evidence, is much broader than the Immunity Provision in the instant Proffer Agreement, which immunized only "information provided . . . *during the proffer session* . . . ." *Id.*; [Doc. 28 at 14] (emphasis added). In other words, while there was language in the *Hill* proffer agreement that arguably immunized derivative evidence, no such language exists in the instant Proffer Agreement.

Defendant also relies on two cases recently decided by different judges on this Court, which found proffer agreements with language similar to the instant Proffer Agreement to confer derivative use immunity. *See* [Doc. 50 at 8–10]; *see generally* [Doc. 59]; *U.S. v. Culton*, No. 1:18-cr-168-TCB-2, Dkt. 274 (N.D. Ga. Mar. 25, 2022); *U.S. v. Norkus*, No. 1:21-cr-328-MLB-2, Dkt. 219 (N.D. Ga. May 16, 2024). Nevertheless, the judges in those cases found that the proffer agreements provided derivative use immunity because they determined that the agreements were ambiguous and construed those ambiguities in favor of the defendants. *See Culton*, No. 1:18-cr-168-TCB-2, Dkt. 274 at 16–17; *Norkus*, No. 1:21-cr-328-MLB-2, Dkt. 219 at 6–8. For the reasons discussed above, however, the undersigned finds that the Proffer Agreement's language is unambiguous and respectfully departs from his colleagues' decisions in *Culton* and *Norkus*. *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) (quoting 18 J. Moore et al., Moore's Federal Practice § 134.02[1] [d], p. 134–26 (3d ed. 2011)) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon

34

the same judge in a different case."). In short, the Court finds that no ambiguity exists because there is no language in the Proffer Agreement that can be reasonably interpreted to confer derivative use immunity. *See CNH Indus. N.V. v. Reese*, 583 U.S. 133, 134 (2018) (emphasis added) ("A contract is not ambiguous unless it is subject to more than one *reasonable* interpretation[.]"). For these reasons, the Court overrules Defendant's objections and adopts the Magistrate Judge's finding that the Proffer Agreement provides only direct use immunity.

### iv.     The Contents of Defendant's Phones

Having decided that the Proffer Agreement immunizes only that evidence which Defendant provided during the Proffer Session, the Court must next determine whether the Government may use as affirmative evidence the contents of Defendant's phones, which were seized during Defendant's arrest and which Defendant provided passwords to unlock and consented to search during the Proffer Session. In other words, the Court must determine whether the contents of Defendant's phones are direct or derivative evidence. The Court respectfully disagrees with the Magistrate Judge and concludes that the phones' contents are direct evidence that Defendant "provided . . . during the proffer session[.]" [Doc. 28 at 14].

When the Proffer Session occurred, the Government had in its possession Defendant's phones but could not access their contents because they were password

protected. Nor had the Government applied for warrants to search the phones or otherwise attempted to access the phones' contents through password-solving technology. *See* [Doc. 56 at 5–6]. Thus, while the Government already had in its possession the contents of Defendant's phones, the only way it could access them at that particular time was to ask Defendant for their passwords. And, by asking Defendant for the passwords, the Government would, functionally, be asking Defendant to hand over the contents of his phones so that the Government would be spared the trouble, expense, and uncertainty of attempting to access the phones' contents using other means.[5] That is precisely what happened in this case. Using the terminology of the Proffer Agreement, it is much more accurate to characterize the contents of the phones as "information [Defendant] provided . . . during the proffer session" (*i.e.*, direct evidence) than evidence which the Government obtained by "pursu[ing] . . . investigative leads derived . . . from the proffered information" (*i.e.*, derivative evidence). [Doc. 28 at 14]. There was simply no investigating for the

---

[5] The Government claims that it would have been able to access the phones' contents using software or by simply guessing their passwords. [Doc. 56 at 6–7]. However, given that nearly four years have elapsed since Defendant provided the Government with his passwords, the Court does not share the Government's confidence that it could have used technology to access the phones at that time. As the Government explained, the "technology allowing law enforcement to access cellular devices without the passcode/passphrase is constantly evolving and improving," and "as time goes on, software providers . . . develop the algorithms necessary to access more and more devices." [*Id.* at 6]. In any event, the Government could not have accessed the phones' contents *when it did* without Defendant consenting to the search and providing the passwords.

Government to do after Defendant provided the passwords. It immediately possessed the phones' contents.

The Court finds it helpful to analogize to non-digital facts. Assume that a drug trafficker places drugs inside of a chest and locks the chest with a manual combination lock that only he knows the combination to. The drug trafficker is later arrested, and the Government seizes the chest but is unable to open it. Suspecting that the chest contains drugs, the Government brings the chest to a proffer session and asks the drug trafficker for the lock's combination. If the trafficker provides the lock's combination and the Government opens the chest, is it fair to say that the drugs inside are derivative evidence? Or, assume that a drug trafficker keeps a book of drug recipes that are written in a code language that only he can decipher. The trafficker is arrested, and the Government seizes the recipe book but is unable to read it. If the Government asks the trafficker at a proffer session to explain his secret code so that the Government can read his recipe book, is it fair to say that the translated recipes are derivative evidence? The Court believes that the answer to each of these questions is no and that there is no material difference between these hypotheticals and the facts of the instant case.

The Court also finds persuasive Defendant's argument that it is impossible to divorce the contents of the phones from Defendant's actions in consenting to them being searched and providing their passwords. *See* [Doc. 50 at 20–22]; [Doc. 55 at

37

3–7]. By consenting to the Government searching the phones and providing their passwords, Defendant confirmed that the phones belonged to him and that he had control over their contents. And, even if the phones' contents were not themselves direct evidence, Defendant's acts in consenting to the searches and providing the passwords certainly were. Thus, if the Government were to introduce the phones' contents in its case-in-chief, it would have no way of establishing a chain of custody or authenticity without relying on Defendant's immunized testimony in consenting to the searches and providing the passwords. In similar cases, albeit ones that involved statutory grants of immunity, the Supreme Court and the Eleventh Circuit held that the Government could not introduce such evidence because it "did not magically appear in the prosecutor's office like 'manna from heaven.'" *U.S. v. Hubbell*, 530 U.S. 27, 42 (2000); *see In re Grand Jury Subpoena Duces Tecum Dated March 25, 2011*, 670 F.3d 1335, 1352 (11th Cir. 2012). The same rationale supports the exclusion of the phones' contents at the trial in this case.[6]

Having found that the phones' contents are direct evidence, the default result is that they may not be relied upon by the Government as affirmative evidence before

_____

[6] The Court notes that the case relied on by the Magistrate Judge to find that the contents of the phones were derivative evidence, *U.S. v. Otunyo*, differs in this respect. *See* No. 18-251, 2021 WL 638817 (D.D.C. Feb. 18, 2021); [Doc. 45 at 54]. In that case, the Government had independently discovered the password to the defendant's phone and had accessed its contents *before* asking the defendant for the password. *Id.* at *3, *12. Thus, the "manna from heaven" issue that is present in this case did not exist in *Otunyo*.

the grand jury or at trial. However, the Court asked the parties at the April hearing to provide briefing on whether the phones' contents could be admissible under the inevitable discovery doctrine.  *See* [Doc. 54]. At that time, the Court believed that the inevitable discovery doctrine might apply if the Government could show that it would have ultimately accessed the phones' contents without Defendant providing his consent or the passwords. After reviewing the parties' briefs and performing independent research, however, the Court finds that the inevitable discovery doctrine—a Fourth Amendment concept—is inapplicable in this context. *See* [Doc. 55]; [Doc. 56]; [Doc. 57].

Instead, the use of the phones' contents is governed entirely by the terms of the Proffer Agreement. That is because "[d]ue process requires the government to adhere to the terms of any plea bargain or immunity agreement it makes." *U.S. v. Harvey*, 869 F.2d 1439, 1443 (11th Cir. 1989). And, "courts will enforce the agreement when the defendant or witness has fulfilled his side of the bargain." *Id.* at 1444. Here, Defendant signed the Proffer Agreement, which was written by the Government, and fulfilled his side of the bargain by truthfully answering the Government's questions. Now, the Government must be held to the bargain that it entered into, even if it will be unable to use evidence that it would have under a different proffer agreement or under an exception to the Fourth Amendment's exclusionary rule.  Accordingly, because the phones' contents are direct evidence,

which is immunized by the Proffer Agreement, the Government may not rely on them as affirmative evidence before the grand jury or in its case-in-chief.

The Court is satisfied that enforcing the terms of the Proffer Agreement yields the fairest resolution. To begin, due process requires that the Proffer Agreement be enforced because, "by testifying under a grant of immunity[, Defendant has forgone] his fifth amendment privilege." *Harvey*, 869 F.2d at 1444. Moreover, despite the Government's many structural advantages, courts readily enforce agreements between the Government and criminal defendants when the outcomes are similarly harsh for defendants. For example, plea agreements often contain appeal waivers, and the Eleventh Circuit routinely enforces such waivers even if a criminal defendant has a meritorious argument on appeal. *See U.S. v. Grinard-Henry*, 399 F.3d 1294, 1296 (11th Cir. 2005) ("An appeal waiver includes the waiver of the right to appeal difficult or debatable legal issues or even blatant error."). Here, precedent and fairness require the Court to enforce the plain terms of the Proffer Agreement.

Accordingly, the Government may not rely on the contents of Defendant's phones in its case-in-chief.[7] However, because the Proffer Agreement does not immunize derivative evidence, the Government is not prohibited from relying on evidence that it derives from the contents of Defendant's phones. For example, while

---

[7] That is, unless Defendant or Defendant's attorney "subsequently takes a position in any legal proceeding that is inconsistent with the proffered information." [Doc. 28 at 14].

the Government could not introduce a text message from Defendant's phone that says, "Walter sold drugs to Gus," the Government could interview Walter or Gus and have them testify about the drug deal referenced in the text message.

>    v.    *Defendant's Request for a* Kastigar *Hearing and Dismissal of the Indictment*

In *Kastigar*, the Supreme Court held that a government entity seeking to prosecute a witness who has been immunized under the federal immunity statute, 18 U.S.C. § 6002, has the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony. 406 U.S. 441, 460 (1972). Although *Kastigar* dealt specifically with the federal immunity statute, the Eleventh Circuit has extended *Kastigar*'s protections to individuals who have informal direct and derivative use immunity agreements with the Government. *See U.S. v. Harvey*, 869 F.2d 1439, 1444–45 (11th Cir. 1989). Therefore, when a criminal defendant is granted direct use and derivative use immunity in a proffer agreement, the Court must provide "the government the opportunity to meet its burden under *Kastigar* of proving the independent source[s] of its evidence." *Id.* at 1445.

However, where an immunity agreement provides only direct use immunity and not derivative use immunity, courts consistently find that no *Kastigar* hearing is necessary. *See U.S. v. Mathis*, 239 F. App'x 513, 515–16 (11th Cir. 2007) (affirming

district court's denial of a *Kastigar* hearing where proffer agreement "allow[ed] the government to use anything derived from the proffer agreement except the defendant's statements and information making up the proffer"); *see also U.S. v. Smith*, 452 F.3d 323, 337 (4th Cir. 2006) (finding no *Kastigar* hearing is required where the agreement conferred direct use immunity only, and the government did not use the immunized testimony); *U.S. v. Catano*, 65 F.3d 219, 226 (1st Cir. 1995) (finding no *Kastigar* hearing necessary where only direct use immunity, rather than derivative use immunity, was granted). This is because "the Government need not have independently obtained the information used against the person immunized" when no derivative use immunity is provided. *U.S. v. Perraud*, No. 09-60129-CR, 2010 WL 298601, at *9 n.6 (S.D. Fla. Jan. 20, 2010).

Moreover, Defendant's counsel conceded at the April hearing that no *Kastigar* hearing is necessary if the Proffer Agreement permits the Government's use of derivative evidence. Because the Court has determined that the Proffer Agreement does not immunize derivative evidence, no *Kastigar* hearing is necessary in this case, and Defendant's request for such a hearing is denied. Dismissal of the indictment is also not warranted because, as demonstrated by the summary of his grand jury testimony above, SA Moore did not rely on any immunized evidence before the grand jury. Thus, the indictment was not improperly obtained using immunized testimony, and Defendant's *Kastigar* Motion [Doc. 28] is denied.

E.  Motion to Dismiss Illegal Re-Entry Count

The final motion before the Court, Defendant's Motion to Dismiss [Doc. 21], requests that the Court dismiss Count Three of the indictment, which charges Defendant with illegally re-entering the United States in violation of 8 U.S.C. § 1326(a). *See generally* [Doc. 21]. According to Defendant's Motion, 8 U.S.C. § 1326(a) violates the equal protection guarantee of the Fifth Amendment under the standard articulated in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), because it was enacted with a discriminatory purpose and has a disparate impact against Mexican and Latino individuals. [*Id.*]. After engaging in a thorough discussion, the Magistrate Judge recommended that the Motion be denied, regardless of whether the statute was analyzed under rational basis or strict scrutiny review. *See* [Doc. 45 at 66–76]. Defendant now objects that the Magistrate Judge erred by "refus[ing] to accept the clear evidence of racial animus underlying the bill," and by "ignor[ing] the historical evidence" that Defendant cited in his Motion. [Doc. 50 at 32–33].

After reviewing Defendant's objections, the Court agrees with the Magistrate Judge's analysis and finds that the Motion should be denied. In so finding, the Court assumes, as Defendant argues, that 8 U.S.C. § 1326 is subject to review under the standard articulated in *Arlington Heights*. To show that a statute violates equal protection under *Arlington Heights*, a litigant must prove that the statute was enacted

43

for a discriminatory purpose or intent and that it has a disparate impact. *See Arlington Heights*, 429 U.S. at 265–66. To prove that a statute was enacted for a discriminatory purpose, the challenger must show that racial discrimination was at least "a motivating factor" for the statute's enactment. *Id.* "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266. This analysis involves considering factors such as the "impact of the official action," the "historical background of the decision," the "specific sequence of events leading up to the challenged decision," "[d]epartures from the normal procedural [or substantive] sequence," and the "legislative or administrative history." *Id.* at 266–68. If the challenger meets his burden of showing a discriminatory purpose and disparate impact, the burden then shifts to the Government to show it would have enacted the law without the discriminatory purpose. *Id.* at 270 n.21.

Defendant does not cite any authority that specifically refutes any of the Magistrate Judge's analysis. *See* [Doc. 50 at 31–33]. Moreover, Defendant's only substantive objection is that the Magistrate Judge ignored the evidence that Defendant relied on in his Motion, but that is simply untrue. *See* [*Id.* at 32–33]. Instead, the Magistrate Judge considered the evidence Defendant presented in his Motion and found it insufficient to show discriminatory purpose *as it specifically relates to the enactment of § 1326 in 1952*. [Doc. 45 at 70–75]. Defendant relies

44

heavily on evidence about the legislative history and background of the 1929 enactment of the Undesirable Aliens Act ("UAA"), which was § 1326's predecessor. *See* [Doc. 21 at 8–30]. However, as the Magistrate Judge explained, the motivations Congress had when it enacted the UAA are of limited relevance in determining Congress's intent 23 years later when it passed § 1326. *See U.S. v. Sanchez-Garcia*, 98 F.4th 90, 99 (4th Cir. 2024) ("[T]he ugly origin of the 1929 Act is not enough to overcome the presumption that 1952's Congress enacted § 1326 in good faith and without racially discriminatory intent."); *U.S. v. Barcenas-Rumualdo*, 53 F.4th 859, 866 (5th Cir. 2022) (explaining that, when reviewing § 1326, "the UAA is not our point of reference").

For the reasons that the Magistrate Judge explained, see [Doc. 45 at 72–75], Defendant has failed to show that Congress had a discriminatory purpose or intent when it enacted § 1326 *in 1952*. *See Sanchez-Garcia*, 98 F.4th at 96 ("Claims just like this have been considered and rejected by dozens of courts around the country. Virtually without exception, all have found that regardless of the origins of the 1929 Act, it cannot be shown that § 1326, enacted almost 25 years later, was motivated by racial bias."); *see also U.S. v. Rodriguez-Soto*, No. 4:22-CR-0018-SEG-WEJ, 2022 WL 17852518, at *4 (N.D. Ga. Dec. 21, 2022) (collecting cases finding no discriminatory purpose in enacting § 1326). Lacking sufficient evidence to prove

discriminatory purpose or intent, Defendant's equal protection claim fails, and his Motion to Dismiss is denied.

### IV. Conclusion

For the foregoing reasons, Defendant's Confidential Informant Motion [Doc. 24], Motion to Dismiss [Doc. 21], Motion to Suppress [Doc. 25], Motion for *Kastigar* Hearing [Doc. 28], and Motion to Suppress Pole Camera Surveillance [Doc. 29] are **DENIED**. The Court **ADOPTS IN PART** the R&R [Doc. 45] as the Order and opinion of the Court, **REJECTING** only the Magistrate Judge's finding that the contents of Defendant's phones are derivative evidence that may be relied upon by the Government in its case-in-chief. Instead, the Court finds that the contents of Defendant's phones are direct evidence that are immunized by the Proffer Agreement.

**IT SO ORDERED**, this 13th day of June, 2024.